Whitaker, Senior Judge,
delivered the opinion of the court:
This action arises out of a contract between Lipsett, Inc.[1] and the defendant’s Bureau of Yards and Docks of the Department of the Navy. The contract, dated January 30, 1953, provided that the plaintiff, in return for $1,480,112 (subsequently increased by change orders to $1,700,166.50), would construct certain aircraft maintenance facilities at the Naval Air Station, Willow Grove, Pennsylvania, by December 31,1953.
Performance of the contract was substantially completed on May 3,1955, some 518 calendar days beyond the scheduled completion date. Although the contract contained a clause for the assessment of liquidated damages against the plaintiff for each day of delay beyond the original completion date, none were assessed. Instead, the defendant extended the time of performance of the contract the entire 518 days of the overrun.
On January 30, 1956, the plaintiff submitted to the contracting officer claims totalling $248,665.76 as compensation for certain additional items of work. By letter of April 17, 1956, the defendant advised the plaintiff that the contracting officer had determined that, except for an item relating to engineering expense, its claims were considered to be “in the nature of claims for damages and therefore could not be the subject of compensation under the contract.”
On May 11, 1956, the plaintiff appealed the contracting officer’s decision to the Secretary of the Navy and at the same time submitted all of its claims, except for the item relating to engineering expense, to the General Accounting Office. The General Accounting Office, by settlement certificate dated December 4, 1956, disallowed plaintiff’s claims in their entirety.
Subsequently, the Armed Services Board of Contract Appeals, acting for the Secretary of the Navy, ruled that the issuance of the settlement certificate precluded further consideration by the Board of those claims submitted to the *681 General Accounting Office.[2] With respect to the single item of claim not referred to the General Accounting Office, the Board ruled that further proceedings would be in order. However, the plaintiff thereafter withdrew this claim (for engineering expense) from the Board’s consideration.[3]
On November 9, 1959, the plaintiff filed a petition in this court asserting that the defendant breached the contract as follows: (a) the original plans were defective and faulty; (b) defendant was dilatory in making necessary contract changes and taking other action; (c) a trial and error method was imposed upon plaintiff by defendant to accomplish certain aspects of the construction and this was contrary to the contract terms and was unreasonable and costly to plaintiff; (d) the magnitude and nature of some of the changes were beyond the scope of the original contract; and (e) the frequency and extensiveness of the revisions to other phases of the construction work were also unreasonable and beyond the scope of the contract. As a result of these breaches, plaintiff contended that its costs of construction were increased and performance of the contract was protracted unduly and into periods of more adverse conditions than would otherwise have occurred.
An extensive trial was held[4] and our trial commissioner issued a report in which he determined that the defendant unreasonably delayed the plaintiff in the performance of the *682 contract work by a total of 420 days out of the 518-day overrun period He further determined that as a result of these unreasonable delays the plaintiff incurred delay costs for idle equipment, field supervision, winter protection, rehandling materials, maintaining excavations, wage and material price increases, and additional insurance premiums.
As the case comes to us, the parties accept the trial commissioner’s report with the following exceptions: The defendant contends that only 300 days (as opposed to the 420 days found by the trial commissioner) were unreasonable delays attributable to the defendant. The plaintiff accepts the trial commissioner’s findings on the extent of the delay but contends that he erred in not allowing two items of damage, to wit, for excess home office overhead and loss of productivity of its labor force. For reasons hereinafter set out, we are of opinion that the defendant’s exception is without merit and agree with the trial commissioner that the extent of delay was 420 days, but we think that in computing plaintiff’s damage the trial commissioner should have allowed plaintiff’s claims for excess home office overhead and loss of productivity of its labor force. We thus adopt the trial commissioner’s findings and factual conclusions with a few exceptions and additions.
Since the defendant contests the extent of the delay, it will be necessary to state the facts in some detail.
The contract provided that plaintiff was to furnish the materials and perform the work for the construction of a large airplane hangar with an attached leanto. The airplane hangar building was to be 240 feet by 150 feet in dimension and was to have a reinforced concrete arch-type roof with an arch span of 150 feet. The sides of the arch were to rest on concrete columns which in turn were supported by foundation footings placed in the ground. A one-story building, called a leanto, with a partial basement was to be constructed at the north side of the hangar and was to be 240 feet long by 100 feet wide. In addition, the plaintiff was to install various utility systems in and around the building, including a sewer line, a steam line, a water line, a sprinkler system, an electrical system, a telephone system, and a fire alarm system.
Prior to letting the bids for the construction of these *683 facilities, the defendant had contracted with The Ballinger Company, a Philadelphia-based firm of architects and engineers, for the preparation of plans and drawings describing the contract work.[5] It was the plans and drawings prepared by The Ballinger Company upon which plaintiff based its bid and according to which it expected to perform the contract work.
Because of the unusual design of the hangar building, which required the exterior building foundations to carry the entire weight of the structure (principally a concrete roof supported by 9 arches), the 18 foundation footings for the arch columns were of utmost importance. The foundation plan showed 9 arch-column footings along the D-line (south side of the hangar building), running the length of the building at about 30-foot intervals, to be placed at elevation 325 feet or about 8 or 9 feet below the ground surface. The elevations along the E-line (north side of the hangar building) were shown at 320 feet, which was about 11 feet below the surface of the ground. In addition, notes appearing on the plan stated that the arch-column footings were to bear on rock good for a safe load of 15 tons per square foot.
In arriving at the elevations for the arch-column footings which appeared on the foundation plan, The Ballinger Company had relied upon information obtained from some 11 test borings made by the defendant at the construction site.[6] Test bores 2, 5, and 8 were along the D- or south arch-column footing line, and showed either shale or sandstone at elevation 325 feet. Test bores 1, 4, and 7 were along the E- or north arch-column footing line, and showed red sandstone at test bore 1 at elevation 320.71, fractured sandstone at test bore 4 at elevation 320.61, and fractured sandstone at test bore 7 at elevation 317.21. There is no evidence in the record that any tests of the bearing value of the material underlying the arch-column foundation footings were made until after several of the footings had been poured and in place.
*684 On March 4, 1958, the first shipment of reinforcing steel for the building foundations arrived at the site and excavations for foundations of both the leanto and the hangar proceeded. By April 14,1953,6 arch-column footings, D-3, D-4, D-5, D-6, D-7, and D-8, for the hangar had been poured.
In each instance approval of the defendant’s inspection force had been obtained before concreting.
On April 15, 1953, up to which time the foundation work had been progressing in an orderly manner, defendant’s resident officer in charge of construction began to have grave doubts as to the bearing capacity at the excavations for two of the D-line footings yet to be poured and at the first excavations for the E-line footings. Because of the nature of the material in these excavations, he directed the plaintiff to make bearing tests on the rock at a level 3 feet below the foundation plan elevations for footings E-8 and E-9. In addition, he or the Government inspection force requested that a representative of the architect-engineering firm visit the construction site to inspect the foundation material in the excavations then opened.
Two representatives of The Ballinger Company came to the site on April 17, 1953. Upon inspection of the excavations they found material at the contract depth which in their opinion would not be adequate for the 15-ton bearing value called for on the drawings. They therefore recommended that additional load tests and core borings be made at several of the arch-column footing locations.
As a result of encountering this apparently unsuitable bearing rock, the defendant ordered the plaintiff to stop all pouring of footings on April 17,1953, and to stop all foundation work on April 24, 1953. Inasmuch as the foundation work was the essential and initial phase of performance, the entire project substantially came to a halt except for work involved in the subsoil investigations directed by the defendant.
From April 23 to May 6,1953, new subsoil investigations, under the supervision of The Ballinger Company, were conducted by means of core borings and load tests. During these investigations, it was discovered that layers of clay existed *685 at the subgrade elevations where the arch-column and basement footings were designed to rest. Because of this condition, the necessary bearing capacity of 15 tons per square foot did not exist at the contract elevations, and revision of the design of the foundations was considered necessary.
After evaluating the results of the new load tests and core borings and consulting with Roberts and Schaefer Company, its design subcontractor, and with a soil mechanics expert that it had engaged to inspect and consult regarding the subsoil conditions, The Ballinger Company, on May 8, 1958, submitted its report to the defendant on the foundation difficulties. Thereafter, on May 26, 1953, the defendant forwarded to plaintiff a revised foundation drawing, dated May 25, 1953,[7] which directed that the E-line footings were to be lowered to elevation 312 from the originally designed elevation of 320 and that the D-line footings not yet installed were to be lowered to elevations yet to be determined. These revised elevations were subject to the suitability of the rock at the new depth which was to be confirmed by visual inspection. In addition, the drawing directed that for each foot of elevation that a footing was lowered the length of the footing would be increased by one-half foot, and that an appropriate amount of reinforcing steel would be added. It also provided that in the center of the excavations for each of these footings there was to be excavated an additional hole 4 feet by 5 feet by 2% feet deep for the addition of a key. When the reinforced concrete was placed in the footing excavation, there would then be this block of concrete projecting down an additional 2y2 feet. Its purpose was to withstand the horizontal thrust against each of the arch-column footings. With regard to footings D-3 through D-8 which had previously been installed, the revised plan provided that they were to remain in place but in lieu of adding a key, they were to be reinforced by a ring of concrete under and around the center of the footings.
*686 When, issued, the revised drawing of May 25, 1953, was considered by defendant and its architect-engineers to be the final revised contract drawing. However, on July 20, 1953, the defendant issued a further revision with regard to the arch-column footings.[8] This revision rescinded that portion of the revised plan of May 25, 1953, which had added concrete rings to the previously poured footings D-3 through D-8. The new revision directed that these footings be removed and new footings with keys be installed at elevations varying from 318 to 320 rather than the originally designed elevation of 325.
In early June, after receipt of the May 25, 1953, revised foundation plan, plaintiff resumed work on the foundations. It was not, however, permitted to excavate down to the elevations specified on the revised drawings. Bather, it was directed by the defendant to excavate 1 or 2 feet at a time starting in the existing excavations at elevations 320 and 325, prepare the key excavation, and then level off and trim the excavation into finished form, in order that it could be inspected by defendant’s representatives. If the rock appearing was not deemed suitable by the inspectors, another foot or two of excavation was required, the leveling off and trimming again performed, and another inspection made until defendant’s inspectors became satisfied that the rock uncovered possessed adequate bearing capacity. This requirement, which indicated that, if satisfactory rock was not found at the designated subgrade elevations, additional excavation would be required, made it necessary for plaintiff to plan the construction of each footing, including the dimension and amount of reinforcing steel and concrete required, on an individual basis as approvals of the excavations were given by defendant’s representatives. This trial and error procedure which prolonged significantly the construction of the footings was contrary to good engineering practice and a substantial change in the construction procedure from the original drawings as well as a distortion of the revised design.
*687 As it turned out, none of tbe arcb-column footings were actually poured at tbe elevations designated on tbe revised foundation plans. The short of it is that they were ultimately placed at various elevations ranging from 5 to 10 feet lower than originally designed. This was a significant change from the original foundation plans inasmuch as the revised drawings had made the size of each footing dependent upon its elevation and had required the addition of a hey thereto. It also precluded almost completely the reuse of footing forms which under the original plans could have been reused since many of the footings were there specified as being the same size and shape.
Under these circumstances we are of opinion that the changes made as a result of encountering the unsatisfactory material at the subgrade elevations were of such magnitude that they were not within the scope of the original contract but rather constituted a breach thereof. Saddler v. United States, 152 Ct. Cl. 557, 287 F. 2d 411 (1961); Stapleton Constr. Co., Inc. v. United States, 92 Ct. Cl. 551 (1941).
That the original specifications were defective is beyond dispute. They misrepresented the nature of the bearing value of the material underlying the foundation of the structure at the prescribed elevations and hence the dimension and depth at which the arch-column footings were to rest to such an extent that the changes required to complete the structure were beyond the scope of the original contract. It is well-settled that when the Government orders a structure to be built, and in so doing prepares the specifications prescribing the character, dimension and location of the construction work, it implicitly warrants that if the specifications are complied with, satisfactory performance will result. United States v. Spearin, 248 U.S. 132 (1918); Laburnum Constr. Corp. v. United States, 163 Ct. Cl. 339, 325 F. 2d 451 (1963). When, as here, defective specifications delay completion of the contract, tire contractor is entitled to recover damages for defendant’s breach of this implied warranty. Laburnum Constr. Corp. v. United States, supra; Warren. Bros. Roads Co. v. United States, 123 Ct. Cl. 48, 105 F. Supp. 826 (1952); Stapleton Constr. Co., Inc. v. United States, supra.
*688 In addition, the defendant was dilatory both in recognizing the need for and in making appropriate revisions to the defective foundation plans. Defendant should have determined whether the subgrade rock had adequate bearing capacity prior to approving the pouring of the first D-line footings. Upon finally recognizing that the subgrade rock was unsatisfactory, defendant or its agents should have completed the redesign of the foundation with all due haste so that plaintiff could have continued the foundation work without any significant delay.
Furthermore, the defendant should not have imposed upon the plaintiff the unreasonable trial and error method of excavation once the revised design had been completed. This requirement, together with the extremely slow recognition and correction of the defective plans, constituted a breach of the implied obligation contained in every contract that neither party will do anything that will hinder or delay the other party in performance of the contract. Cf. Chalender v. United States, 127 Ct. Cl. 557, 119 F. Supp. 186 (1954) ; J. A. Ross & Co. v. United States, 126 Ct. Cl. 328 (1953); George A. Fuller Co. v. United States, 108 Ct. Cl. 70, 69 F. Supp. 409 (1947).
That these breaches of contract by defendant caused considerable delay in connection with the foundation work is clear from the foregoing. Plaintiff is of course entitled to recover the damages which it incurred because of this delay.
Upon consideration of the evidence, our trial commissioner has determined that the defendant unreasonably delayed the progress of the foundation work for a period of 330 days of the total of 420 days’ delay. This finding is fully supported by the record.
The defendant has taken exception to this finding on two grounds. First, it contends that the 330 days of unreasonable foundation delay, which the trial commissioner has charged to it, should be reduced by 90 days because the plaintiff agreed in change order “L,” which granted a time extension of 304 days, that 129 days were attributable to strikes. Ninety of these 129 days, according to defendant, have been included by the trial commissioner in the 330 days of unreasonable *689 delay wbicli be attributed to the defendant in connection with the foundation work.
The only evidence in the record of strikes which occurred during the period of time that plaintiff was engaged in foundation work concerns a general carpenters’ strike from April 14 until June 17, 1958, except for 6 days between April 22 and April 30, and a reinforcing steel workers’ strike from April 19,1953 to July 6,1953. The trial commissioner has found, and he is fully supported by the evidence, that neither of these strikes resulted in any delay of the foundation work inasmuch as plaintiff had no need for carpenters or reinforcing steel workers during these periods because of the suspension of work on the contract by the defendant due to the difficulties then being encountered with the elevation and design of the arch-column footings. Defendant does not seem to dispute the trial commissioner’s factual finding that the strikes did not actually delay the foundation work but says plaintiff agreed they did by its acceptance of change order “L.” Plaintiff is not bound by the terms of this change order. It consisted of a letter from the contracting officer extending the time for the performance of the contract for 304 days. (The total of all change orders issued extended the time 518 days.) The contracting officer did say that 129 days of the 304 days was due to strikes, but the plaintiff is not bound by that. It was interested only in the extension of time, so that it would not be assessed liquidated damages, and not in the reasons assigned by the contracting officer for granting the extension. It has long been the rule in this court that in a case such as this, the cause or extent of delay determined by a contracting officer in a grant of additional time is not final and conclusive nor entitled to overwhelming weight. Robert E. Lee & Co., Inc. v. United States, 164 Ct. Cl. 365, 368 (1964), and cases there cited.
Second, defendant contends that the trial commissioner’s allocation of 330 days to unreasonable foundation work delay should be further reduced by 30 days which, according to defendant, should have been allowed as a reasonable length of time to make the necessary design changes once it was *690 determined that the original elevations for the arch-column footings were not acceptable.
Ordinarily, defendant is entitled to make necessary changes, but where the change is necessitated by defective plans and specifications defendant must pay the entire resulting damage without any deduction for time to make changes, as would be the case if the redesign were necessitated by a changed condition or the like. See Laburnum Constr. Corp. v. United States, supra.
Based on the foregoing, we are of opinion that the defendant was responsible for 330 days of unreasonable delay in connection with the foundation work.
In addition to the 330 days of unreasonable delay in connection with the foundation work, the trial commissioner also found that the defendant unreasonably delayed plaintiff 90 days in connection with other aspects of the construction work. About these 90 days there is no dispute so we do not state the facts as to them. It is sufficient to say that, as with the foundation delays, they resulted from defendant’s breaches of contract, and plaintiff is entitled to recover any damages that it suffered as a result thereof.
In summary, we reach the conclusion that the defendant unreasonably delayed the plaintiff in the performance of the contract work by a total of 420 days out of the 518-day overrun period.
The trial commissioner has determined that the plaintiff suffered delay damages and additional expenditures directly attributable to the defendant’s breaches in the amount of $85,544.92. This amount is made up of 81 percent (-HI-) of the overrun period costs for idle equipment, field supervision, winter protection, rehandling materials, maintaining excavations, and wage and material price increases plus 100 percent of an insurance premium plaintiff was required to pay. (See infra findings 46-54, 57.) This fairly represents the damages suffered by plaintiff with regard to those items.
We come now to consider two elements of damage not allowed by the trial commissioner, to wit, home office overhead and loss of productivity of labor.
*691 Home ofioe overhead. In finding 6, the trial commissioner finds that on June 28, 1957, in response to a request of the officer in charge of construction, plaintiff executed a release releasing the Government from all claims against it with certain exceptions. Then in finding 49(b) of his report, the trial commissioner says that he is making no finding with reference to home office overhead as an item of damage, since the exception in the release “relates only to overhead ‘in the field.’ The language of the release clearly waives any claim for any overhead not ‘in the field’ which can only mean the job site. * * *”
We are of opinion that the trial commissioner was in error in finding that plaintiff was not entitled to home office overhead and hence in failing to determine the amount thereof. Home office overhead is a well-recognized item of damage for delay and plaintiff would be entitled to recover it, if it did not release its claim to it. J. D. Hedin Constr. Co. v. United States, 171 Ct. Cl. 70, 347 F. 2d 235 (1965); F. H. McGraw & Co. v. United States, 131 Ct. Cl. 501, 130 F. Supp. 394 (1955); Fred R. Comb Co. v. United States, 103 Ct. Cl. 174 (1945).
The defendant in its answer did not set up the release as a defense to plaintiff’s claim, as it is required to do under Rule 19 (b), nor was any mention made of it in the trial of the case, nor did defendant ask the trial commissioner to make any finding with respect to it. Hence, under Rule 20(h) this defense is waived.
But, even if defendant had properly pleaded the release as a defense, we do not think it waived plaintiff’s claim to home office overhead.
The release was executed in response to the letter of the officer in charge of construction dated June 20, 1957, in which he stated that there was an outstanding balance in plaintiff’s favor of $100, for which he requested plaintiff to submit an invoice and a release, so that his books could be closed; but in his letter he stated: “Payment of this outstanding balance and execution of these releases qualified does not in any manner prejudice your pending claims. The releases may be qualified to indicate the extent to which the release is given.”
*692 Tbe release executed by plaintiff, dated 8 days later, contained tbe following exception:
* * * except that it is specifically understood and agreed that nothing contained herein shall release, re-mise or discharge, the government, its officers, agents and employees from, nor in any way prejudice contractor’s right to, payment in any amount arising out of any transactions with respect to which claims or requests.for payment dated May 11,1956 were directed to the United States General Accounting Office and the Secretary of the Navy, nor shall anything contained herein prevent or bar contractor from pursuing any and all remedies to collect sums in any amount arising out of such claims and requests for payment. * * *
The release recited that it was not intended to “prejudice contractor’s right to payment in any amownt arising out of any transactions with respect to which claims or requests for payment dated May 11, 1956” had been made. [Emphasis supplied.] It will be observed that the exception to the release is couched in terms of no narrow scope. It excepts “any amount arising out of any transactions with respect to which” claim was made in the named letter. It is unlimited as to the amount of any claim so long as the claim was specified in the letter. If it arose “out of job operating expense in the field” (upon which the trial commissioner apparently relies), it is excepted from the release. Home office overhead, of course, arose out of “job operation in the field,” and, hence, is excepted from the release.
Faced with language so sweeping, defendant was fully justified in not pleading the release as a defense to plaintiff’s claim, and the trial commissioner was in error in holding it waived overhead.
This brings us to the task of determining the amount of plaintiff’s home office overhead. Prior to trial, the defendant, through its Federal Bureau of Investigation (FBI), audited plaintiff’s books and records, and based thereon stated its differences with the amount of damages plaintiff had alleged its books and records reflected. Thereafter, the plaintiff stipulated that it accepted the FBI audit as accurate. The FBI audit shows that the total home office overhead for the 818 days of the contract (300-day original contract period *693 plus 518-day overrun) allocable to the Willow Grove job was $171,228.68.[9] We bave held that a contractor can recover as damages the amount of overhead on a daily basis allocable to the period of overrun for which the Government is responsible. See, e.g., J. D. Hedin Constr. Co., Inc. v. United States, supra, at 108, 347 F. 2d at 259. The prorated amount of the full overhead of $171,228.68 allocated to the 518-day overrun is $108,430.87. From this figure must be deducted $11,350 which plaintiff had previously received for home office overhead by change orders, and $19,366.88 which is a duplication of costs included in another item of its claim.[10] This results in a net amount of $77,713.99 of additional home office overhead attributable to the 518-day overrun period.[11] Since the defendant was responsible for 420 days of the 518-day overrun period, the plaintiff is entitled to recover as damage 81 percent (-fff-) of the additional home office overhead attributable to that period, or $62,948.33.[12]
Loss of Productivity. The second item of damage, not allowed by the trial commissioner, claimed by plaintiff to *694 have been caused by defendant’s delay was loss of productivity of its labor force. First, it says tbe delay required it to work during severe winter weather between December 1, 1953 and March 10, 1954, and again between November 25, 1954 and January 19, 1955; second, from March 11 to August 11,1954, it had to work under adverse water conditions; and, third, the constant revisions in the contract drawings resulted in confusion and interruption of the orderly progress of the work.
For this loss of productivity of its labor, it claims damages in the aggregate amount of $131,116.66. In its proposed findings of fact plaintiff asked the trial commissioner to make findings accordingly, but the trial commissioner did not do so because, we suppose, he was of opinion that the release signed by plaintiff embraced this claim. As we have heretofore stated, we disagree with the trial commissioner and are of opinion that plaintiff is not foreclosed from relying upon this claim.
Except for the fact that there has already been a shockingly long period of time since plaintiff first presented its claim to the contracting officer and the date the case reached us for decision, we would remand the case to the trial commissioner for findings on both this claim and home office overhead, but, under the circumstances, we feel compelled to make findings ourselves on these two items.
The testimony on loss of productivity is far from satisfactory. Plaintiff’s sole witness on this point was John Crawford, who had been in plaintiff’s employ for about 10 years and who was its chief of construction at the time the work on this job was being done. However, at the time of his testimony he had left plaintiff’s employ and was then chief engineer in the New York area for the Frouge Corporation of New York City and Bridgeport, Connecticut, a company with which plaintiff had no connection. It was a large company, with $50 million worth of building construction in that area, consisting of housing developments, apartments, and office buildings. Mr. Crawford had graduated as a civil engineer from Columbia University in 1924, since which time he had been engaged in both heavy and building construction work.
*695 He was a competent witness, well-qualified to express an opinion on the loss of productivity of the labor. But, strangely, plaintiff offered no corroboration of his testimony. But, stranger still, defendant did not cross-examine him on this point and offered no testimony in rebuttal. His testimony stands unchallenged.
The defendant’s sole reply to plaintiff’s request that the trial commissioner find the facts as testified to by this witness was in its exceptions to plaintiff’s proposed findings of fact. In this document, defendant made only this reply:
Plaintiff’s productivity losses, so-called, were based on estimates, entirely unverifiable.
Defendant considered this item unproved. It entirely neglects allowances for time consumed by strikes, plaintiff’s own delays, and other nongovernment delays.
That loss of productivity of labor resulting from improper delays caused by defendant is an item of damage for which plaintiff is entitled to recover admits of no doubt, Abbett Electric Corp. v. United States, 142 Ct. Cl. 609, 162 F. Supp. 712 (1958); nor does the impossibility of proving the amount with exactitude bar recovery for the item. Needles v. United States, 101 Ct. Cl. 535, 618 (1944); cf. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 688 (1946), and cases there cited.
In Story Parchment Co. v. Paterson Co., 282 U.S. 555, 561 (1931), cited in Anderson v. Mt. Clemens Pottery Co., supra, the trial court had instructed the jury to determine as an element of damage:
* * * (1) the difference, if any, between the amounts actually realized by petitioner and what would have been realized by it from sales at reasonable prices except for the unlawful acts of the respondent; * * *.
The Court of Appeals was of the opinion that no recovery could be had on this item because
* * * there was no basis for a reasonable inference that prices in excess of those actually realized would have prevailed if there had been no combination; and that, in any event, there was no damage which could be measured and expressed in figures not based on speculation and conjecture. Ibid.
*696 With, respect to this holding, the Supreme Court said, at 562-63:
It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. * * *
^5 í*»
Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. * * *
It is a rare case where loss of productivity can be proven by books and records; almost always it has to be proven by the opinions of expert witnesses. However, the mere expression of an estimate as to the amount of productivity loss by an expert witness with nothing to support it will not establish the fundamental fact of resultant injury nor provide a sufficient basis for making a reasonably correct approximation of damages. See Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 199, 351 F. 2d 956, 968 (1965).
Crawford’s testimony is unrebutted. Defendant, out of whose pocket the money must come to pay the large sum testified to by him, did not undertake to discredit his testimony, and so, While it is the sacred duty of this ¡court to protect the Government from unrighteous demands as well *697 as to protect the citizen from imposition by the Government, we cannot wholly reject this witness’ testimony on the question of amount of damage.
However, we cannot ignore the fact that he was plaintiff’s former employee and had been over a period of 10 years. While he was not in plaintiff’s employment at the time he testified, he quite properly had a certain predilection for his old employer and wanted to “help them out” all he could. His sympathy was naturally with his former employer rather than with the Government. We do not mean the witness was dishonest, but we do think he made his estimates as high as he could to the extent his conscience would permit.
Crawford testified that between December 1, 1953, and March 10, 1954, the productivity of plaintiff’s labor force was reduced inasmuch as the men had to work outside on trench excavations and foundation construction in winter weather. This required them to wear gloves and warmer clothing, and to work on ground which was frozen and/or extremely wet because of the rising ground water during that time of year. Based on his overall experience in construction work and his observation of this particular job, he estimated that the average loss of productivity of labor during this period was 33ys percent. With regard to the period between March 11, 1954, and August 11, 1954, Crawford testified that the labor productivity was reduced 25 percent because of adverse water conditions encountered at the construction site. During the period from August 12, 1954, to November 24,1954, Crawford estimated that the average loss of productivity of plaintiff’s labor force was 20 percent because of confusion and interruption of normal job progress as a result of several revisions by defendant of the contract drawings for the leanto building. Crawford also estimated that the loss during the period from November 25, 1954, to January 19, 1955, was 20 percent due to cold weather conditions when the men had to work in an only partially completed structure.
That winter weather and adverse water conditions reduce the efficiency of a labor force in the performance of construction work only stands to reason. It has been held by this *698 court tha/t when loss oí productivity brought about by these conditions results from defendant’s breach of contract, the plaintiff is entitled to recover its additional costs occasioned thereby as damages. F. H. McGraw & Co. v. United States, 113 Ct. Cl. 29, 82 F. Supp. 338 (1949); Abbett Electric Corp. v. United States, supra. However, with respect to the loss of efficiency caused by the revisions to the leanto plans during the period from August 12,1954, to November 24,1954, there is no testimony that there was a loss of efficiency on this account other than Crawford’s estimate of the amount thereof. Proof of damage is essential before estimates can be received of the amount thereof. Plaintiff’s claim for loss of productivity during that period must therefore be rejected. See Wunderlich Contracting Co. v. United States, supra, at 199, 351 F. 2d at 968.
Notwithstanding the fact that Crawford’s estimates regarding the other three periods are unrebutted, we cannot ignore the fact that the percentages testified to were merely estimates based upon his observation and experience. Furthermore, his estimates are much higher than those testified to in other cases in which the conditions were not materially different from those present here. Taking these things into consideration and in view of the fact that no comparative data, no standards, and no corroboration support his testimony, we are constrained to reduce his estimates based on the record as a whole and the court’s knowledge and experience in such cases to 20 percent, or $11,091.02 for the period from December 1, 1953, to March 10,1954; to 10 percent, or $13,014.87 for the period from March 11 to August 11,1954; and to 10 percent, or $925.50 for the period from November 25,1954, to January 19,1955.
The total additional cost to plaintiff during the 518-day overrun period because of loss of productivity of its labor force was thus $25,031.39. (See infra finding 56.) Because of a duplication of costs included in another of plaintiff’s claims, $4,550.63 must be deducted from this total figure. This results in a net cost to plaintiff of $20,480.76 because of loss of productivity of its labor force. Since the defendant was responsible for 420 days of the 518-day overrun, *699 plaintiff is entitled to recover 81 percent of this amount, or $16,589.42.
We have found that the plaintiff is entitled to recover $62,948.33 for excess home office overhead. Adding these two items to the $85,544.92 found by the trial commissioner makes a total of $165,082.67. A judgment for this amount is entered in favor of plaintiff against defendant.
BINDINGS OK FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Luria Brothers & Company, Inc. (hereinafter referred to as Luria), a Delaware corporation, is successor in interest to the original plaintiff, Lipsett, Inc. (hereinafter referred to as Lipsett), and has been duly substituted for the latter firm by order of this court as such plaintiff. Lipsett had been a wholly owned subsidiary of the plaintiff and has been dissolved, with all assets transferred to the plaintiff, which assumed all outstanding liabilities of Lipsett. The word “plaintiff” in subsequent findings will be used to refer to either Luria or Lipsett.
2. This suit is based upon contract No. NOy-73198, dated January 30, 1953, between the plaintiff and the defendant, acting through its Bureau of Yards and Docks of the Department of the Navy, whereby plaintiff agreed to construct for the defendant certain aircraft maintenance facilities at the Naval Air Station, Willow Grove, Pennsylvania. During the performance of the contract, the defendant determined that various portions of the contract plans and specifications could not and/or should not be carried out as specified and as a consequence made changes in respect to concrete foundations, utility lines and building superstructure, as well as other phases of the work.
Plaintiff asserts that defendant breached the contract as follows: (a) the original plans in respect to the foundation and utility lines were defective and faulty; '(b) defendant was dilatory in making necessary contract changes and taking other action; (c) a trial and error method was imposed upon plaintiff by defendant to accomplish the construction of the *700 foundation and utility lines and this was contrary to the contract terms and was unreasonable and costly to plaintiff; (d) the magnitude and nature of the foundation and superstructure changes were beyond the scope of the original contract; and (e) the frequency and extensiveness of the revisions to other phases of the construction work also were unreasonable and beyond the scope of the contract.
Plaintiff asserts that as a result of such breaches of contract its costs of construction were increased and performance of the contract was protracted unduly and into periods of more adverse conditions than would otherwise have occurred.
3. Pursuant to the Invitation for Bids issued by the Navy’s Bureau of Yards and Docks for the construction of aircraft facilities at the Naval Air Station, Willow Grove, Pennsylvania, plaintiff and 5 other contractors submitted bids as follows:
Wai-k and Company-$1, 544,000
Perry J. Goldman Construction Co_ 1,772,223
Lipsett, Inc_ 1,480,112
B. M. Shoemaker_ 1, 588, 923
Thompson Construction Corp_ 1, 527, 976
Moyer Brothers_ 1,569, 000
Bids were opened on January 29,1953, and on January 30, 1953, the contract was awarded to plaintiff with notice of the award being received by plaintiff on January 31,1953.
The contract entered into between plaintiff and defendant was contract No. NOy-73198, dated January 30,1953, in the amount of $1,480,112. The contract amount was subsequently increased by change orders to $1,700,166.50. The contract documents consisted of a duly executed standard contract form, the specifications issued with the invitation for bids, schedules, and drawings, together with addenda 1 through 4.
A performance bond in the amount of the original contract price was executed by a surety conditioned upon performance of the work in accordance with the contract terms.
4. The contract provided that performance was to commence on January 31,1953, and was to be completed on December 1,1953, a period of 10 months.
*701 Tlie contract also provided for an assessment of liquidated damages in the sum of $400 per calendar day for each day that completion of the contract was delayed beyond the said completion date.
The contract was substantially completed by plaintiff on May 3, 1955. No liquidated damages were assessed by defendant and the time for performance was extended by defendant to May 3,1955, or a total of 518 additional calendar days.
5. The contract between the parties and the specifications and addenda thereto are in evidence as plaintiff’s exhibit 1; the change orders are in evidence as plaintiff’s exhibit 10. These materials are incorporated herein by reference. For convenience, there are quoted below, the following provisions of the contract and specifications:
CoNtraot No. NOy-73198 $ $
ARTICLE 3. GOVERNMENT AND CONTRACTOR’S REPRESENTATIVES
(a) The work will be under the general direction of the Contracting Officer, who shall designate an officer of the Civil Engineer Corps, United States Navy, or other officer or representative of the Government, as Officer in Charge of Construction, hereinafter referred to as the “Officer in Charge,” who shall, under the direction of the Contracting Officer, have complete charge of the work, and shall exercise full supervision and general direction of the work, so far as it affects the interest of the Government.
(b) The provisions in this Article or elsewhere in this contract regarding supervision, approval or direction by the Contracting Officer or the Officer in Charge or action taken pursuant thereto are not intended to and shall not relieve the Contractor of responsibility for the accomplishment of the work either as regards sufficiency or the time of performance, except as expressly otherwise provided herein.
(c) The Contractor shall at all times be represented at the site of the work in person or by a competent foreman or superintendent satisfactory to the Contracting Officer. The Contractor’s representative shall have authority to act for the Contractor in all matters concerning the work.
*702 ARTICLE 4. PERFORMANCE OF THE WORK
(a) Worlcmcmship — Material — Workmen. — Unless otherwise specifically provided for in the specifications, all workmanship, equipment, materials, ana articles incorporated in the work covered by this contract are to be of the most suitable grade of their respective kinds for the purpose. Where equipment, materials, or articles are referred to in the specifications as “equal to” any particular standard, the Officer in Charge shall decide the question of equality. The Contractor shall furnish to the Officer in Charge for his approval the name of the manufacturer of machinery, mechanical and other equipment which he contemplates incorporating in the work, together with their performance capacities and such other information as may be pertinent or required by the Officer in Charge. When, and to the extent, required by the specifications, or by the Officer in Charge, the Contractor shall furnish the Officer in Charge for approval full information concerning the materials or articles which he contemplates incorporating in the work. Samples of materials shall be submitted for approval when so directed. Machinery, equipment, materials, and articles installed or used without such approval shall be at the risk of subsequent rejection. The Contracting Officer may require the Contractor to remove from the work such employees as the Contracting Officer deems incompetent, careless, insubordinate, or otherwise objectionable, or whose continued employment on the work is deemed by the Contracting Officer to be contrary to the public interest.
(b) Changed Conditions. — Information respecting the site of the work given in drawings or specifications has been obtained by Government representatives and is believed to be reasonably correct but the Government does not warrant either the completeness or accuracy of such information and it is the responsibility of the Contractor to verify all such information; Provided, That in case of subsurface, latent, or unknown conditions, this contract may be modified, when, in the maimer, and to the extent hereinafter in this subparagraph provided: Should the Contractor encounter, or the Government discover, during the progress of the work, subsurface or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered *703 and generally recognized as being inherent in work of the character provided for in the drawings and specifications, the Contracting Officer shall be notified before the existing conditions are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ, the contract shall be modified by the Contracting Officer to provide for any increase or decrease in cost and difference in time resulting from such conditions and an equitable adjustment in the pertinent contract terms shall be made in accordance with the provisions of paragraph (a) of Article 10 hereof. Such modification by the Contracting Officer shall be final, subject only to appeal under the provisions of Article 16.
* * * * ❖ (f) Protective Measures. — The Contractor shall protect the materials and work from deterioration and damage during construction and shall store and secure inflammable material from fire, remove oily rags, waste, and refuse from buildings each night and during cold weather furnish all heat necessary for the proper conduct of the work. He shall provide and maintain all temporary walkways, roadways, trench covers, barricades, colored lights, danger signals, and other devices necessary to provide for safety and traffic.
ARTICLE 5. SPECIFICATIONS AND DRAWINGS
(a) Conflicts — Omissions — Misdescription — Misinformation. — The Contractor shall keep on the work a copy of the drawings and specifications and the Officer in Charge shall at all times have access thereto. Anything mentioned in the specifications and not shown on the drawings or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between the drawings and specifications the specifications shall govern. Omissions from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of work but they shall be performed as if fully and correctly set forth and described in the drawings and specifications. & ‡ * *
*704 (e) Interpretations and Instructions. — All questions regarding the figures, drawings, plans, and specifications and tbe interpretation thereof and the resolving of conflicts and inconsistencies therein shall be determined by the Contracting Officer, and such determination shall be final, subject only to appeal under the provisions of Article 16.
# if: ❖ * *
ARTICLE 6. PAYMENT AND RELEASE
H; 5¡: # ❖ ❖
(e) The Contractor and each assignee under an assignment in effect at the time of final payment shall, if required by the Contracting Officer, execute and deliver at the time of and as a condition precedent to final payment, a release in form and substance satisfactory to and containing such exceptions as may be found appropriate by the Contracting Officer, discharging the Government, its officers, agents, and employees of and from liabilities, obligations, and claims arising under this contract.
íj: ‡ ❖ H*
ARTICLE 9. TESTING FOUNDATIONS
Tests of the bearing value of the material underlying the foundation of the structure to be built shall be made at such times and places and in such a manner as may be directed by the Officer in Charge. As far as practicable, test piles, when used, shall be so located that they can become part of the finished structure. The Contractor shall furnish the Officer in Charge ample opportunity for viewing tests and making such records as the latter may consider advisable. The Contractor shall be entitled to compensation for making such tests in the same manner as for a change required by the Contracting Officer under Article 10 to the extent the contract price does not include compensation therefor. Notice must be given of intention to request compensation in accordance with Article 10.
ARTICLE 10. CHANGES AND EXTRAS
(a) The Contracting Officer may at any time or times, by a written order, and without notice to the sureties, make changes in the drawings or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the cost of doing the work under this contract, or in the time required for its performance, an equitable adjustment in the pertinent *705 contract terms shall be made as hereinafter provided and the contract shall be modified in writing accordingly. Any claim of the Contractor for such an adjustment must be made in writing to the Officer in Charge within 10 days from the receipt of such change order or within such longer period as may be allowed by the Contracting Officer. If the Officer in Charge considers that such change should result in a decrease in the Contractor’s compensation or time for performance or both, he shall so notify the Contractor. In either case, the equitable adjustment shall be made in accordance with the mutual agreement of the parties, provided, however, that if the parties are unable to agree, the Contracting Officer shall determine such equitable adjustment, if any, to be made in the contract terms, and his determination shall be final, subject only to appeal under the terms of Article 16. In making such determination, the Contracting Officer shall, in those instances where the adjustment to be made in compensation is estimated by the Officer in Charge to amount to $10,000 or more, convene, and give full consideration to the report of, an advisory board of three members, consisting of two Government representatives appointed by the Contracting Officer and one representative appointed by the Contractor. This board shall estimate and report to the Contracting Officer the amount of the change in cost, time, or both, resulting from the ordered change. In making such estimate, the estimated cost of additions shall be based upon the estimated actual cost to the Contractor and the estimated cost of deductions shall be based upon the estimated cost to the Contractor as of the time the contract was made. To such cost estimates, 6 percent shall be added by said board to adjust the Contractor’s profits. In arriving at the amount of the change in price, if any, allowance may be made at the discretion of the Contracting Officer for overhead and general expenses, plant rental, and other similar items.
(b) Nothing provided in this article shall excuse the Contractor from diligently proceeding with the prosecution of the work so changed.
:ji tjí Hí ❖
ARTICLE 16. DISPUTES, REVISED
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date *706 of receipt of such, copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive; provided that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
If this contract obligates Navy appropriations other than those designated Public Works, Navy (appropriation 17X1205), the article entitled “Disputes” is amended by adding after the last sentence the following words: “Notwithstanding the foregoing provisions, the Contractor shall have such right of appeal to the Court of Claims as is provided by Section 635, Public Law 488, 82nd Congress”.
*****
NAVDOCKS SPEOIITCATION NO. 34377
***** Section 1. General Clauses
*****
1-21 Site Inspection: The bidder is invited to visit the premises for the purposes of inspection and to familiarize himself with the actual existing conditions that may affect the work. The contractor shall not be entitled to extras for difficulties encountered that would have been foreseen had proper inspection of the premises been made. Soil boring data is available for the inspection of the bidders.
***** Section 2. Earthwork.
*****
2-02. Character of excavation. — The bidders are expected to examine the site of work and borings available at the office of the Officer-in-Charge of Construction, and thus decide for themselves the character of the materials tobe encountered.
*707 2-03. Elevations cmd obstructions. — Bids shall be based on the following:
(a) that the surface elevations are as indicated; _
_ (b) that no pipes or other artificial obstructions, except those indicated, will be encountered; and
(c) that hard material will not be encountered.
In case the actual conditions differ substantially from those stated, and/or shown, an adjustment in the contract price and/or the time for completion of the work will be made in the same manner as provided by article 4 of form no. 197, and subject to the requirement of notification thereunder being given. Hard material shall be defined as solid ledge rock, boulders more than one-half cubic yard in volume, or any cemented material requiring blasting for removal.
*****
2-05. Excavation.—
(a) General. — Excavation shall be carried to dimensions and depths as indicated necessary for, and properly incidental to, the completion of the work called for by these specifications and drawings. Excavation shall be unclassified and all materials shall be removed.
(b) Excavation shall be carried to suitable bearing strata generally encountered at the elevation indicated on the drawings. If suitable bearing is not encountered at the elevations indicated on the drawings, the contractor shall carry the excavation down to suitable bearing as directed. If the contractor excavates below the depth indicated on the drawings, or directed by the Officer-in-Charge of Construction, the excavation shall be restored to the proper elevation with approved backfill properly compacted, except that in excavations for foundations the concrete shall be extended to the bottom of the excavations, at the expense of the contractor. Excavation shall extend a sufficient distance from walls and footings to allow for installation and removal of formwork, and for installation and removal of formwork, and for inspection. [sic]
$ * $ 4* *
(f) Site grading shall be maintained by the contractor to prevent water running to excavation areas of the building. Water accumulated in the excavation shall be removed by the contractor at his own expense.
* * * H* *
6. As provided in the contract, after completion of all work, the acting officer in charge of construction requested the plaintiff to execute a release. On June 28, 1957, the *708 plaintiff submitted to the defendant its invoice for $100 (thereafter paid), together with a release which released and discharged the government of all liabilities, obligations and claims with the following exceptions however:
* * * except that it is specifically understood and agreed that nothing contained herein shall release, remise or discharge, the government, its officers, agents and employees from, nor in any way prejudice contractor’s right to, payment in any amount arising out of any transactions with respect to which claims or requests for payment dated May 11, 1956 were directed to the United States General Accounting Office and the Secretary of the Navy, nor shall anything contained herein prevent or bar contractor from pursuing any and all remedies to collect sums in any amount arising out of such claims and requests for payment. * * *
7. On January 30,. 1956, the plaintiff submitted to the contracting officer a claim totaling $248,664.76 as compensation for additional work for seven items described therein as follows:
***** 1. Additional job operating expense in the field for the period between the contract date of completion which was December 1, 1953, and the final date of completion-$131,841. 82
2. For protection facilities during cold weather encountered as a result of delays in the progress of the work awaiting changes in design_ 24,210. 88
3. Direct engineering expense in connection with the location and showing on drawings of underground facilities and utilities_ 29,147. 62
4. Storing, reconditioning and handling construction materials during delays awaiting new design_ 10, 970.20
5. Maintaining open trenches, including such work as sheeting, bracing, removing mud, providing temporary bridges across trenches and providing barricades and lights to prevent accidents and injury to persons_ 14, 333. 51
6. Additional insurance to cover possible damage due to blasting operations by the contractor constructing the runway_ 1,119.40
7. Wage and material price increases after expiration of the original date of completion established in the contract_ 37, 041.33
*709 8. On April 17,1956, the plaintiff was sent a letter by a representative of the Chief, Burean of Yards and Docks, Navy Department, stating that after reviewing the facts, the contracting officer determined that with the exception of claim item (C) all items of claim were considered in the nature of claims for damages and as such could not be the subject of compensation under the contract. Further, the letter stated that as to item (C), change order P had fully compensated the plaintiff for this work. It continued that plaintiff’s claims for additional compensation in the total amount of $248,664.76 were denied and that this action was a final decision of the contracting officer. [Emphasis supplied.]
The item (C) referred to was the same item described in the preceding finding as item 8 relating to engineering expense.
9. On May 11,1956, the plaintiff, through counsel, appealed the contracting officer’s final decision of April 17, 1956, to the Secretary of the Navy. On May 11, 1956, the plaintiff, through counsel, submitted 6 of the 7 claims (omitting the matter relating to engineering expense, item 3 referred to in finding 7) to the General Accounting Office. The General Accounting Office, on December 4,1956, disallowed the plaintiff’s claims in their entirety.
10. Because of plaintiff’s election to submit 6 items of the claim both to the General Accounting Office and the Armed Services Board of Contract Appeals, the Board ruled that the issuance of a GAO settlement certificate before the Board had acted on the items was a bar to further consideration of these items within the executive branch, relying on 31 U.S.C. 74 and Brooks-Callaway Co. v. United States, 97 Ct. Cl. 689 (1942).
11. A single item of claim not submitted to the General Accounting Office by plaintiff (denominated item 3 of finding 7) in the claim made to the contracting officer, was in the amount of $29,147.62 covering “engineering expense.” As to this item, the Armed Services Board of Contract Appeals ruled that further proceedings before the Board on item 3 would be in order. Engineering expense items were *710 withdrawn by plaintiff, however, from the Board’s consideration. Items 5 through 14 of plaintiff’s petition at paragraph 42, list engineering type expenses claimed herein, totaling some $82,896.84.
12. The contract provided that plaintiff was to furnish the materials and perform the work for the construction of a large airplane hangar with an attached leanto plus specified utilities. The airplane hangar building was 240 feet by 150 feet in dimension and was to have a reinforced concrete arch-type roof with an arch span of 150 feet. The sides of the arch were to rest on concrete columns which in turn were supported by foundation footings placed in the ground. A one story building, called a leanto, with a partial basement was to be constructed at the north side of the hangar and was to be 240 feet long by 100 feet wide. It was to house maintenance shops.
In addition, plaintiff was also to install several utility systems in and around the building, namely, a sewer line, steam line, water line, sprinkler system, electrical system, and telephone and fire alarm systems.
The Naval Air Station at Willow Grove, Pennsylvania, is approximately 15 to 20 miles north of Philadelphia. At the time that plaintiff entered into its contract there were in existence at the station various airplane landing and maintenance facilities. These existing facilities had been designed by the same architectural firm, The Ballinger Company, which designed the project now in issue.
*13. The plans or drawings describing the contract work and upon which the plaintiff’s bid and the contract price had been based, had been prepared by The Ballinger Company, a Philadelphia-based firm of architects and engineers. In its preparation of such plans and drawings it had subcontracted a portion of the design work to another architectural firm called Roberts and Schaefer Company. This latter firm had designed a similar building for the military-services which had earlier been constructed in the Denver, Colorado, area.
The contract in suit made no reference to services of an architect-engineer in connection with the performance of the contract work. Before the contract work had begun, the *711 plaintiff had been advised that the officer in charge of construction would be Captain J. A. McHenry, who was based at the U.S. Naval Base, Philadelphia, and that the resident officer in charge of construction would be Commander F. V. Cornelius who was stationed at the site of the work at Willow Grove, Pennsylvania.
14. The work began at the site of the work on February 16, 1953, with one foreman and four laborers who began by erecting a field office. The plaintiff’s superintendent, Mr. H. Dempsey, came to the job beginning on February 26, 1953. For a period of 6 working days as a part of getting the job started, it was necessary that the plaintiff remove some airplane landing mats which were on the ground where the hangar was to be constructed. The plaintiff did this work. It is not shown in the evidence how many were removed. Although the plaintiff claims damages for delay as to this item, this appears to be an afterthought of plaintiff, as there had never been any claim for delay as to this item until proof was offered at the trial.
The plaintiff has been paid an additional sum of $3,119, representing labor, material and equipment, overhead and profit for the extra work involved in the removal of the landing mats. The extra work was covered by change order N of the contract.
■15. At the location of the hangar building and the leanto, 8 test borings had been made. In addition, 3 test borings were made at the location of a “future” building which was to be on the opposite side of the hangar from the leanto. From the information obtained from the test borings, the foundation plans upon which the plaintiff bid and from which it expected to erect the foundations for the hangar and leanto had been prepared for the Navy by The Ballinger Company. Because of the unusual design of the hangar building, which required the exterior building foundations to carry the entire weight of the structure, including an arched concrete roof 150 feet wide by 240 feet long, the 18 footings for the arches were of the utmost importance. The foundation plan showed the 9 arch footings along the D-line, running the length of the building at about 30-foot intervals, to be placed at elevation 325 feet or about 8 or 9 feet below the *712 ground surface. The elevations of tbe E-line of the hangar on the other side of the building, running along its length, were shown at 320 feet, which was about 11 feet below the surface of the ground.
Test bores 2, 5 and 8 were along the D-line and showed either shale or sandstone at elevation 325. Test bores 1,4 and 7 were along the E-line and showed red sandstone at test bore 1 at elevation 320.71, fractured sandstone at test bore 4 at elevation 320.61, and fractured sandstone at test bore 7 at elevation 317.21.
Notes appear on the foundation plan stating that footings of the leanto, except the basement, were to bear on virgin soil capable of supporting 4,000 pounds per square foot. Notes relating to the arch footings and basement footings in the leanto stated that such footings were to bear on rock good for a safe load of 15 tons per square foot. One note on such plan states:
Note: Basement Footings and arch footings to bear on grey or red sandstone capable of supporting 30,000 #/□' [pounds per square foot].
16. There is no evidence in the record that any “[t]ests of the bearing value of the material underlying the foundation of the structure * * *” were made until April 15, 1953. There is also no evidence that any were directed by the officer in charge until that time. (See finding 5; Article 9 of contract.)
On March 4, 1953, the first shipment of reinforcing steel for the building foundations was delivered to the site. Excavation for foundations of both the leanto and the hangar proceeded. While there were several days of inclement weather early in the job, there is no evidence that it was unusual in amount. From April 14 until June 17, 1953, the carpenters were on strike and away from the job, except for 6 days between April 22 and April 30. In view of the events later to be described, the carpenters’ strike had no appreciable effect upon the conduct of the work by the plaintiff.
17. The plaintiff encountered hard rock when it was excavating for footing D-8. This was called to the attention of the contracting officer. A record was kept of the extra work *713 required on account of this and other rock encountered in the excavation of trenches for water lines, electrical ducts, sanitary sewer line and steam line. An equitable adjustment in the contract price under Article 10 and Section 2-03 of the specifications was effected by the issuance of a change order accepted by the plaintiff, which increased time for performance of the contract work by 20 additional days.
18. By April 14,1953, 6 footings, D-3, D-4, D-5, D-6, D-7 and D-8, for the concrete arches for the hangar building had been poured. Before the concreting, of course, steel reinforcing rods were placed in the forms. Also before concreting, the approval of the government’s inspection force was obtained. Because of the nature of the material in the excavation for footings D-l and D-2 and the first excavations for the E-line of arch footings, the plaintiff was on April 15, for the first time, directed to make a bearing test on the rock at a level 3 feet below the drawing elevations for footings E-8 and E-9. Grave doubts as to the bearing capacity of the foundation material at excavations E-8, E-9 and also D-l and D-2 were held by the defendant’s resident officer in charge by this time.
On April 16,1953, the government inspection force or the resident officer in charge requested, either directly or through channels, that a representative of the architect-engineer firm visit the construction site to inspect the foundation material in the excavations then opened. Two representatives of The Ballinger Company came to the site of the work on April 17, 1953, and made their initial recommendations to the government representative. These were to have a further test bore made at excavation D-l and leveling of excavation E-9 prior to conducting a soil bearing test in those areas. Additionally the Ballinger representatives recommended that 2 load tests be made in the excavation of the basement of the leanto which was to contain the heavy mechanical equipment for the hangar.
19. On April 20, 1953, The Ballinger Company wrote to the officer in charge of construction at Philadelphia (not the resident officer) the following letter:
As requested by your telephone call of April 17th, 1953, we have made an inspection of the foundation material encountered at the above project. The writer met *714 Mr. Erickson at the site and the following comments were transmitted to him verbally at that time.
The excavation at footing D-l had approximately 18" of mud and water at the bottom so that it was impossible for us to observe the material at the bottom of the excavation. Judging from the layer of clay directly above the bottom of the excavation, it seemed likely that solid rock has not been reached.
The material at the proposed bottom of footings in the basement area was inspected and in our opinion is not satisfactory for the 15 ton bearing value called for on the drawings. The excavation for the arch-column footings adjacent to the basement area were inspected and we do not believe that the material uncovered at the contract depth is adequate. A sump hole has been made at arch-column footing E-9 which is about 2' deeper than the contract depth. Although this sump was partially filled with water, it appeared that stronger material was being encountered.
In view of the above conditions, we would recommend the following procedure:
(1) There should be a minimum of two load tests made on the material at the bottom of the lean-to column footings in the basement area to determine the allowable soil value for this material. Once this value has been determined, the footing design may be modified to suit and the footings can be kept at the present elevation. We believe that this would be cheaper than increasing the depth to find solid rock.
(2) We believe that the excavation for the arch-column footings along line E should be continued to a depth approximately equal to the sump elevation. If the material at this level is still in doubt, we would recommend that a core boring at each end of each footing be made to determine the depth to solid rock.
(8) We would recommend that a core boring be made at each end of arch-column footing D-l to ascertain the depth of solid rock.
(4) Since the sudden change in depth of hard rock between arch-column footings D-2 and D-l does not seem reasonable, if the hard rock encountered under footing D-2 is a solid strata, we would recommend that the nature of the material under D-2 be further investigated by means of a core boring between column lines 2 and 3.
*715 The core borings should be approximately 2" in diameter and should be made a minimum of 5' deep or as much deeper as is required to determine whether or not solid rock has been reached. The results of these borings will show the nature of the material below the bottoms of footings and will indicate whether it is more economical to continue to solid rock or to increase the size of footings near the present elevations.
The term “core boring” has been used throughout since it is our belief that all the material in question is too hard for normal churn drilling, however churn drilling can be utilized in place of coring wherever it is possible.
If the above procedure is adopted, we believe that the results of the program should be transmitted to this office as quickly as possible since it will be necessary to redesign any arch-column footings which extend to a greater depth than that which is shown on the contract drawings.
20. It is a fair inference from the evidence that the resident officer in charge of construction (Cornelius) was replaced by an officer from the Bureau of Yards and Docks, Washington (Kerns) due to the failure of the government inspection force to recognize a bad foundation situation as to the 6 arch footings which had been poured and later had to be removed.
21. As of April 15, 1953, the foundation work had been progressing in an orderly manner.
As a result of the encountering of unsuitable bearing rock on April 15,1953, and on specific order of defendant, pouring of concrete footings stopped on April 17,1953, and all foundation work stopped on April 24,1953.
Inasmuch as the foundation work was the essential and initial phase of performance, the entire project substantially came to a halt except for work involved in the subsoil investigations directed by defendant.
Although it is the contention of the defendant that foundation work could have proceeded as to some of the arch footings, it is abundantly clear from all the evidence that the bearing quality of all foundation material was suspect, even as to the material below the already poured 6 arch footings.
22. From April 23 to May 6, 1953, subsoil investigations were conducted by means of core borings and load tests for the purpose of determining the bearing capacity of the rock at the subgrade elevations of the foundation footings.
*716 During these investigations, it was discovered that layers of clay existed at the subgrade elevations where the arch-column and basement footings were designed to rest. Two-foot layers of clay were found within the red and grey sandstone. Also there were relatively thick seams of plastic clay layers between the shale and sandstone at the subgrade elevations.
Because of these conditions, the necessary bearing capacity of 15 tons per square foot did not exist at the subgrade elevations, and revisions to the design of the foundations were necessary. The elastic nature of the soil existing at sub-grade elevations would eventually have caused rotation and settlement of the footings and consequent damage to the superstructure.
The new subsoil investigation was conducted under the supervision of The Ballinger Company, the architect-designer of the project. In addition to evaluating the subgrade conditions during the investigation, Ballinger also engaged Professor Gregory P. Tschebotarioff of Princeton University, “one of the nation’s leading soil mechanics experts,” to inspect and consult regarding the subsoil conditions.
23. On May 3,1953, Professor Tschebotarioff submitted to The Ballinger Company the following report on his inspection and analysis of the foundation difficulties:
This letter is to give you a brief summary of the conclusions arrived at by me as a result of the visits to the above site of construction on April 29, 30 and on May 2; of the conferences held at the above site with yourself and Commander Cornelius; and of a further study in my office of the data which was made available to me. I understand that you need this summary for a conference tomorrow afternoon, May 4. Naturally, I cannot send you a detailed report which would include the computations on which I am basing my conclusions. I will be glad to send you later a detailed report with all this material; however at present I hurry to get this letter typed so that I can get it into the mail this evening before closure time.
The following points should be emphasized:
1. The contract elevation of +325 ft., that is a depth of 9 to 10 ft. to the bottom of the excavation, for the 18 main footings of the shops? cannot be maintained everywhere. First of all, there is a clay layer of medium stiff plastic clay under the proposed elevation of footing D-l. *717 This clay layer is approximately 2 ft. thick and reaches down to elevation + 322 ft. Further, as evidenced by our examination of the excavation pits of footings D-2 and D-9, there is fractured shale and sandstone both below and at the elevation of the footing excavation whereby the fractures and horizontal seams in several places were found to be filled with plastic clay of approximately a quarter of an inch thickness in some places. I had no difficulty in pressing that clay out with a %6 in. diameter nail.
The shale layers which have such clay-filled seams cannot be relied upon to take up the horizontal thrust of 332 kips per footing.
2. It is therefore imperative to carry down the 15 footings which have not yet been poured to sounder rock which, even though fissured, has no clay seams in the fissures. There is no such rock above elevation 322 in the new test hole #1. The remaining new bore holes show slight variations of such type of rock. Bore hole #2 appears to indicate that in its vicinity sounder rock with no clay in its fissures does not begin until elevation + 323.5 ft. is reached. Bore holes #8 and #10 appear to indicate that this sounder type of rock is reached about the same elevation where the bottom of the footings has been poured.
3. According to sheet #106, dated 4-28-53, of Eoberts and Schaefer Company, Project 5224, the values of N; H; and e are as indicated on the attached sketch #1. If friction along the base of the footing were to be relied upon to resist the horizontal thrust of 332 kips, then an angle of 37° would be needed to resist this thrust at limit equilibrium. This does not appear satisfactory even on rock where the fractures and seams are relatively clean and free of clay.
4. I therefore recommend that the 15 new footings be designed as indicated on the attached sketch #1. That is, the entire footing should be cut at least 1 ft. into rock with no clay in its seams. Further that a key 4 ft. by 5 ft. in plan be sunk another 2.5 ft. into the rock at a distance of 11 feet from the face of the footings. This key should be designed to resist a horizontal thrust of 227 kips. The pressure exerted by that key on the rock would then be approximately 9 Tons/sq. ft. The sketch #1 and the values given on it refer specifically to the footing D-2. However, the same general design can and should also be applied to the footings D-l; D-9; and to the 9 footings of the E row.
*718 5. As regards the 6 footings which have already been poured, that is footings D-3 to D-8,1 have at first studied the possibility, as indicated on the enclosed, sketch #2, of taking up their horizontal thrust of 332 kips by shear along their base and by the provision of a 15 ft. wide block between the footing and the adjoining fractured shale. There is practically no reliable data on the resistance to horizontal load which can be offered by such shales with clay seams and fissures criss-crossing their entire mass. In my opinion there is reason to believe that their behavior may be somewhat similar to that of the so-called “stiff-fissured” clays (see pp. 193 and 287 of my book “SOIL MECHANICS, FOUNDATIONS AND EARTH STRUCTURES”). In other words, the strength of the mass will be governed by the strength of the weak filler of the seams and fissures. In my opinion a shearing strength not exceeding 1 kip/sq. ft. can be assigned to the clay in the seams which I have examined. On that basis I obtain a resistance of 92 kips for the horizontal surface abed shown on sketch #2 and a lateral resistance of 196 kips against the face ihf on the same sketch. This gives a total lateral limit resistance of 288 kips or a factor of safety of 0.87 in respect to the total thrust of 332 kips. Thus even if the block efghji be made continuous between the footings, that is b=30 ft. and not 15 ft. as shown on sketch #2, a factor of safety smaller than 2 would be obtained, whereas in a case like this I consider that a factor of safety of at least 3 is needed. Thus the idea of taking up the lateral thrust by passive resistance of the fractured shale with clay seams should be abandoned.
6. Instead I recommend for consideration the scheme illustrated by the attached sketch #3. It would be applicable to the 6 footings D-3 to D-8. A 6 ft. by 3 ft. trench would be cut at least 3 ft. deep both at the toe' and at the heel of these footings. If visual examination indicated that the seams were clean fractures with no decomposed clay material in them then the depth of 3 ft. could be maintained, otherwise it would have to be increased so that the key would have a face 3 ft. deep against satisfactory rock. If this can be done, then with suitable reinforcement the keys would be filled with concrete and attached to each other by 1 f t.-wide side-straps on both sides of the old footing. Each of the keys would be designed to resist a thrust of 166 kips, that is one half of the total, using ACI permissible stresses in the design for a 3,000 psi concrete. If in any of the footings, specifically in footing D-3 and D-4, such a suitable key *719 cannot be obtained, then it would appear at the present time that no other alternative will be available than to demolish these footings and to rebuild them in the manner indicated on sketch #1 at a greater depth. I understand that an alternative suggestion to drill in under an angle of 45° two 24 in. diameter bore piles some 7 or 8 ft. deep into the rock is likely to prove too expensive and cost more than the demolition and reconstruction of the old footings.
7. If some fissured shale with clay in its seams is left under the existing footings, then on the strength of the result of load test #2 I would estimate that the toe of such footings with a similar depth of shale beneath it as in test #2 might have a settlement of 20.6 in. This figure will have to be revised downwards once the results of the load test on rock 2 ft. below the old elevation are available.
I would like to emphasize that this letter is typed directly from a dictaphone record since there was no time to have a draft prepared so that I could go over it and improve the general form of presentation. This remark, of course, does not mean that I make any reservations about factual statements made. I would, however, like to add that in order to make final decisions it would be necessary to have the results of the load test #3 as requested by me, in conjuotion [sic] with a clarification of the statements concerning permissible motions of the footing which were made by the representative of the Roberts and Schaefer Company, since these statements appeared to have been somewhat contradictory. I further assume that the results of the test hole #9 have not been in disagreement with the data already handed over to me.
‡ ‡ ‡ $ Enclosures:
3 pages of sketches
24. On May 8,1953, The Ballinger Company submitted its own report to defendant on the foundation difficulties which reads, in part, as follows:
We are writing you at this time to amplify several points which were under discussion at our meeting held on. May 4th in your office in connection with the foundation conditions on the above project.
As you know, it has been impossible to reach a conclusion as to the proper course of action to be followed until all the necessary boring data and load tests have been completed and the results evaluated. We have *720 constantly had to re-appraise our thinking as each new test at the low elevation of approximately 314 at arch column footing E-9 on May 5th, 1953, has required some modification to our recommendations, which we made at the above meeting. As you know, the original test borings which were obtained by the Navy at the request of this office were in error to such an extent that the present condition existing in the field could not be anticipated. Even the additional borings which were made after the hangar location was changed did not disclose the present field conditions. In particular, the original boring No. 8 near column D-l missed an entire layer of clay lying beneath the shale and sandstone from ten to twelve feet below the surface of the ground. This clay layer exists at an elevation where the original bor-ings indicated a reasonably solid layer of sandstone. The proper disclosure of this condition would, of course, have modified the entire design of the foundations before the contract drawings were made. The original borings, further, did not indicate in any way the presence of relatively thick, soft clay seams between the layers of shale and sandstone which now show in the footing excavations. In order to clarify the history of the foundation conditions, we wish to point out that The Ballinger Company was not called upon for a field inspection until after several of the footings were already poured.
At our first field inspection, it was felt by the writer that the condition was more serious due to the above referenced clay layers and the side thrusts from the arches than was expected by field personnel. For this reason, additional data was requested. Load tests were requested in order to predict the range of settlement under the lean-to columns, and the possible rotation of the arch columns; the latter value being highly important, since the original design contemplated foundations on unyielding rock, and any rotation must be forecast and allowed for in the reinforcing of the arches themselves. A pattern of additional borings was also requested at this time in order to determine the extent of the underlying clay layers, and to determine the elevation of solid rock.
Upon receipt of the data from the first few borings, it appeared that the condition warranted consultation from the Koberts & Schaefer Company, who designed the structure of the building. While the opinion of the Huberts & Schaefer representatives was that the footing designed was probably adequate, even under the adverse *721 conditions encountered, Professor Gregory P. Tschebo-tarioff of Princeton University was employed as a Soils Mechanic’s Expert for verification.
Professor Tschebotarioff’s preliminary opinions and recommendations were outlined in general in his letter of May 3d, 1953, addressed to The Ballinger Company, a copy of which was given your office at our May 4th meeting. In this letter, Professor Tschebotarioff recommended that the footings which were not poured be carried to somewhat greater depths, and that they should be enlarged to bring the toe pressure down to 20,000 lbs. per square foot, and that keys should be provided to assist the sliding resistance. For the footings which were already poured, he recommended a system of additional keys at each end of the footings. This recommendation was based upon the expected absence of clay seams in the material below the bottoms of the footings already poured. In view of the above mentioned condition, at footing E-9 it is our belief that these clay seams may well exist, even though they are not shown by core borings.
The results of load test #3, which were received in this office late on May 6th, 1953, have since been reviewed with Professor Tschebotarioff. Assuming that the settlement of the sandstone at slightly higher elevations than where this test was made will fall somewhere in between the settlements of load test #2 and load test #3, it is believed that the rotation of the arch column footings even at 33,000 lbs. per sq. ft., maximum toe pressure, will be within permissible limits for the arches. It is further believed that by increasing the depths of those footings not yet poured and by adding keys under all footings, the resistance of the footings to sliding will be satisfactory. We recommend that keys as shown on the attached sketches #4 and #5 be added to the footings already poured. Provided that when the excavations for these keys are made the clay seams are not more serious than is presently indicated, the safety of the footings against sliding will be adequate. Two further precautions should be noted, however. The space now back-filled with earth between the toes of the footings and the end of the excavation should be filled with concrete. The fire line now shown east of the D line arch footings should be moved to a position just above the ends of these footings. Care must also be taken in the future that the excavations for the next row of future lean-to column footings are kept as shallow as possible.
*722 25. By letter dated May 11, 1953, defendant forwarded to the plaintiff a preliminary drawing showing proposed revisions to column footings in the vicinity of the leanto basement. However, plaintiff was unable to resume foundation work on the basis of this preliminary drawing because these column footings could not be installed until the revision to the adjacent basement footings had been determined.
By letter dated May 26, 1953, defendant forwarded to plaintiff a revised foundation drawing dated May 25, 1953, which directed that the E-line footings were to be lowered to elevation 312 from the originally designed elevation of 320, and further, the D-line footings, 1, 2 and 9 were to be lowered to elevations yet to be determined. The revised drawing also provided that the suitability of the rock at the new elevations was to be confirmed by visual inspection.
Further, in the center of the excavations for each of these footings there was to be excavated an additional hole 4 feet by 5 feet and 2y2 feet deep for the addition of a key. When the reinforced concrete was placed in the footing excavation there would then be this block of concrete projecting down an additional 2% feet. Its purpose was to withstand the horizontal thrust against each of these arch-column footings.
In respect to footings D-3 through D-8, which had previously been installed, these were to remain in place but in lieu of adding a key, they were to be reinforced by a ring of concrete under and around the center of the footings.
This revision also provided that for each foot of elevation that a footing was lowered, the length of the footing would be increased by one-half foot, and that an appropriate amount of reinforcing steel would be added.
None of the above-cited revisions to the footing plans was included in the original design for the arch-column footings. When issued, the revised drawing of May 25,1953, was considered by defendant and its architect-engineers to be the final revised foundation drawing.
26. On July 15, and again on July 20, 1953, defendant issued further revisions to the foundation footings.
By revision of July 15, the subgrade elevations for footings H-l through H-4 were lowered approximately 6 feet, *723 and the slope relationship between the H-line footings and the adjacent, lower E-line footings was limited to 45 degrees.
On July 20, 1953, another revised drawing was issued rescinding the revised plan of May 25, 1953, which had added concrete rings to previously poured footings D-3 through D-8. The new revision directed that those footings be removed and new footings with keys be installed at subgrade elevations varying from 318 to 320 rather than the originally designed elevation of 325. The 6 footings D-3 through D-8 were in fact removed as required by the revision and the footings which took their place were 2y2 to 31/2 feet longer since it was necessary to excavate for the footing an additional depth of 5 to 7 feet.
27. From the suspension of operations on April 15, 1953, until the receipt by plaintiff at the end of May of the first foundation revisions, no foundation work could be performed by the plaintiff. Instead, the plaintiff devoted itself to the performance of exploratory work in order to assist defendant in making the redesign of the footings.
In early June, after the receipt of the May 25,1953, revised foundation plan, work was resumed by plaintiff on the foundations. The excavations which had become extensively flooded had to be pumped out and other preparations had to be made for the resumption of work. In the middle of June, excavation work and the building of forms for footings began, together with some pouring of lean mixed concrete.
From April 14, 1953 to June 17, 1953 (except for 6 days between April 22 and April 30), a general carpenters’ strike occurred in the Philadelphia area, which included the plaintiff’s job. Negotiations with the carpenters’ union were conducted on behalf of the contractors affected by a local association of general contractors. During the period of the strike, the plaintiff had no need for carpenters in view of the aforementioned suspension of foundation work.
From April 19, 1953 to July 6, 1953, the reinforcing steel workers employed by plaintiff’s subcontractor for the installation of reinforcing steel in the concrete were on strike. Plaintiff had no need for these men during the strike period because no installation of reinforcing steel was necessary in view of the suspension of foundation work,
*724 28. The revised foundation plans provided that the excavations for the footings were to be visually inspected prior to the pouring of concrete by representatives of the defendant in order to confirm the adequacy to support each footing of the material found at the new subgrade elevations designated. These new subgrade elevations were 312 for the E-line and varied between 318 and 320 for the D-line. In essence, this requirement in the revised plans indicated that if satisfactory rock was not found at the newly designated subgrade elevations, additional excavation would become necessary.
The revised plans also provided that the length of the footings was to be extended one-half foot for every foot the sub-grade elevation was lowered below the elevations prescribed for each footing on the original plans issued with the invitations to bid. Thus, a footing lowered from the original sub-grade elevation of 325 for the D-line to subgrade elevation of 315 would be increased in length by 5 feet. This increase in size of a footing increased in turn the length and amount of reinforcing steel used in the forming of the footing.
Visual inspections were conducted by representatives of the defendant. It turned out that none of the arch-column footings was actually poured at the subgrade elevations designated on the revised foundation plans. Consequently the size of each footing was not known to plaintiff until the sub-grade conditions for a footing were found satisfactory in respect to bearing capacity and approved by defendant’s representatives. In turn, the amount of reinforcing steel necessary for the footing was not known until that time, nor was the size or shape of the form to be used in the pouring of the concrete for each footing.
This variation from footing to footing required the plaintiff to plan the construction of each footing, including the reinforcing steel and concrete, on an individual basis as approvals of the excavations were given by defendant’s representative. This precluded the reuse of forms for pouring concrete inasmuch as each footing size varied from the others because each footing subgrade elevation varied from the others.
The original plans issued by defendant specified precise subgrade elevations for each footing as well as the exact size *725 and shape of each footing and the amount of reinforcing steel necessary. This limited the types and sizes of footings on the original plans and therefore footing forms could have been reused for footings of the same size. The amount of reinforcing steel for the length of the reinforcing steel rods needed under the original plans had been ordered in advance and received on the job by the plaintiff.
29. The plaintiff was not permitted to excavate down to elevation 312 or the other elevations specified on the revised foundation drawings. Bather, plaintiff was directed by the defendant to excavate 1 or 2 feet at a time starting in the existing excavations at elevations 320 and 325, prepare the key excavation, and then level off and trim the excavation into finished form, in order that it could be inspected by defendant’s representatives. If the rock appearing was not deemed suitable by defendant’s inspectors, another foot or 2 of excavation was required, the leveling off and trimming again performed, and another inspection made until defendant’s inspectors became satisfied that the rock uncovered possessed adequate bearing capacity.
This was a tedious and time-consuming procedure which prolonged the work of construction of the footings. Its purpose was to minimize the amount of excavation needed to reach adequate subgrade material.
Good engineering practice as well as a proper consideration of the extent to which the contract performance was being delayed made this trial and error method for the excavation of the footings an unreasonable procedure. Defendant should have determined the specific elevations for adequate rock so that plaintiff could have completely excavated and immediately proceeded with installation of the footings on the basis of known depths and sizes. Defendant has not established that such a procedure was not feasible, and even if it were not feasible, defendant should have permitted plaintiff to dig a hole at the site of each footing until adequate rock was encountered rather than requiring that each footing site be fully excavated, including the key, cleaned out, followed by an inspection and decision on the suitability of the rock then appearing.
*726 This trial and error method of excavating the footings to adequate rock was a substantial change in construction procedure from the original design. It was a distortion of the revised design as well. In addition, in view of the delay to which the plaintiff had been subjected, it was a requirement which was unreasonable.
00. The defendant was dilatory both in recognizing the need for and in making appropriate revisions to the foundation plans. Defendant should have determined whether the subgrade rock had adequate bearing capacity prior to approving the pouring of the first D-line footings which began April 2, 1953. And upon finally recognizing that the sub-grade rock was unsatisfactory, defendant or its agents should have completed the redesign of the foundations in a week or two at the most so that plaintiff could have continued the foundation work without any significant delay. Defendant has presented no evidence in explanation of its dilatoriness.
Additionally, the requirement that plaintiff perform its footing excavations by the trial and error method, as previously discussed, was an unreasonable requirement which delayed plaintiff’s performance. It also constituted a substantial change from the construction procedure which would have been followed under the original plans and specifications.
Finally, the arch-column footings were placed at elevations 5 to 10 feet lower than originally designed and this constituted a change not within the scope of the contract nor, by the admission of defendant’s own expert, one normally to be anticipated in the nature of the work.
31. The defendant unreasonably delayed the progress of the plaintiff’s work in connection with the foundation work for a period of 330 days. The causes of such delay will be summarized as follows:
The defendant, due to the inadequacy of its soil investigations preliminary to the preparation of its foundation plans, misrepresented the nature of the bearing value of the material underlying the foundation of the structure to be constructed under the contract.
The defendant’s inspection force misled the plaintiff’s work force by approving as adequate the bearing value of the *727 foundation material in the 6 D-line arch, foundations and approving for installation of reinforcing steel and pouring of concrete for such 6 footings. This required consultation among defendant’s inspection force and its architect-engineers extending over many weeks, resulting in the decision to order the removal of the 6 arch footings, each footing having an approximate size of 4 feet by 30 feet by 6 feet.
At a time when important decisions as to the method to be followed were to be made, the transmittal of orders to the plaintiff was unduly delayed by the request of the resident officer in charge at Willow Grove for instructions from higher headquarters; the officer in charge at Philadelphia, with requests 'by that officer for advice, prior to decision, from the architect-engineers, Ballinger; which firm, in turn, had to consult with other engineers, Roberts and Schaefer, as well as the soil expert Tschebotarioff, all of which tended to cause the plaintiff’s overhead expense to increase, until the ultimate decision was communicated to the plaintiff and work could proceed under the changes ordered.
32. In addition to the hangar foundation and building, the contract also provided that the plaintiff would install several utility systems in and around the building, namely, a sewer line, steam line, water line and sprinkler system, electrical system, and telephone and fire alarm systems.
The underground sewer line served as an exit line from the building for waste and consisted originally of a 10-inch line extending from a manhole to be installed at the northwest comer of the building some 650 feet to an existing manhole. Along the run of the sewer line a second manhole was to be installed by the plaintiff.
The underground steam line served to furnish steam from the boiler house for heating and mechanical purposes. The line extended from the boiler house, which was some 2,000 feet east of the hangar, to the hangar and to 2 line or operation shacks situated north and south of the hangar respectively. The total length of the steam lines was approximately 4,000 feet. In addition, 4 manholes were to be installed along these lines.
*728 The water line as originally designed extended underground from an existing water line to the hangar and then along 3 sides of the hangar and to a new manhole. The water line entered the hangar at various points where it both provided water used inside the building and supplied water to the sprinkler system. The sprinkler system consisted of a network of pipes mounted on the ceiling of the hangar within the building for fire control purposes. The water line and sprinkler lines are frequently referred to in the record as the sprinkler system. The outside water lines totaled approximately 1,400 feet.
In addition, about 2,000 feet of underground electric lines were provided as conduits to the hangar from existing electrical sources on the reservation. Finally, there were telephone and fire alarm systems provided in the original plans; the latter system was energized by the interior sprinkler system in case of fire.
33. The plans and drawings for the utility work to be performed by plaintiff were both incomplete and inaccurate. They failed to provide proper elevations for the several lines and necessary tie-ins and failed to disclose the presence of existing underground facilities and other obstructions which were in the paths of the contract utilities. Several lines had to be relocated or supplemented as a result of defective design. The defendant was, in almost every instance, unreasonably dilatory in issuing the revisions necessitated by drawing inadequacies.
For example, in respect to the sewer, the line as designed ran across the comer of an existing building and under several large trees. As a result, the line was rerouted to bypass the building, and a manhole had to be relocated. A short exit sewer line to be installed by plaintiff leading from the hangar was obstructed by footings G-9 and H-9 of the hangar foundations and consequently had to be rerouted. This line was also in the path of a structure to be erected in the future and had to be modified so as not to obstruct the foundation of the future structure. In respect to the steam line it was necessary to excavate an additional 137 cubic yards of earth in order to underpass an existing electrical duct bank. The new electrical line on the other hand was erroneously scaled on the *729 contract drawing so as to indicate a length of only one-half of that intended.
The obstructions to the several utility lines and other inadequacies of the drawings became apparent during the progress of the job and interrupted the usual sequence of construction progress. It is plaintiff’s position that these are instances additional to those involving the foundations which reflect the inadequate and inaccurate planning of the project by defendant and its agents. These defects could not be anticipated by plaintiff prior to bid. Plaintiff had the right to assume that the plans and drawings were accurate and reliable and that no artificial obstructions in the paths of the construction work existed.
34. The contract plans and drawings failed to disclose the presence at the site of many existing underground utilities and other concealed obstructions which lay in the path of the utility lines to be installed by the plaintiff. During the installation of the utilities, plaintiff repeatedly encountered unexpected obstructions which interrupted progress of the work and necessitated numerous field changes and redesign of the lines. Plaintiff had no prior knowledge that these obstructions would be encountered and there is nothing in the plans or specifications reflecting them. On the contrary, the specifications affirmatively represented to plaintiff that “no pipes or other artificial obstructions, except those indicated, will be encountered.”
During the excavation of the sewer trench in June 1953, plaintiff encountered an existing water line, 6-inch sewer line, 3-inch water line, 4-inch water line, and telephone duct. Plaintiff’s engineers thereupon conducted an investigation to locate other existing utilities which might cause further interference. By this investigation, many of the utility obstructions which would be encountered were located. A drawing was prepared by plaintiff showing these obstructions, which drawing was approved by defendant and made an official contract drawing. Even with this study, however, some obstructions were subsequently encountered. For example, on August 23, 1953, during the excavation for the steam line, an existing electrical duct was encountered' and it was necessary to lower the steam line in order to bypass the duct.
*730 Another architect-engineer, the Capitol Engineering Corporation, had prepared designs for additional construction to be performed in the general area of the hangar installed by plaintiff. Included therein was a plan for another steam line, although this was not located directly in the immediate area of the hangar. The Capitol drawings, dated January 7,1953, contained full information concerning existing utilities to be encountered by this other steam line. These drawings in themselves would not have informed plaintiff of the specific obstructions it would have encountered but even so the existence of such drawings was not made known to plaintiff until it undertook to make the investigation mentioned above.
Defendant has not explained its failure to disclose to the plaintiff the location of existing underground installations and obstructions to be encountered. On the other hand, defendant’s records show that its architect-engineer for plaintiff’s work, The Ballinger Company, warned defendant shortly before the issuance of the contract drawings that it had not received from defendant data which would permit it to check proposed underground utilities for noninterference.
35. The defendant had contracted concurrently with Capitol Engineering Company for the design of certain projects which were complemental to that project designed by The Ballinger Company and constructed by plaintiff. The Capitol design included an airplane apron around the hangar, the extension of existing taxiways and runways, and another steam line unrelated to the steam line included in plaintiff’s contract.
The Capitol drawings were issued January 7,1953, between the issuance of the Ballinger drawings on December 19,1952, and the award of plaintiff’s contract on January 30, 1953. The Capitol drawings reflected existing underground utility lines and manholes to be encountered by the prime contractor in the installation of this other steam line system, and also provided adequate data of grade elevations and tie-ins for the utilities, which data was not included in the contract drawings issued to plaintiff for bid and construction purposes. Although the omission of such data from the plain *731 tiff’s contract drawings bad a disruptive effect on the performance of the utility work, defendant has presented no explanation for the omission.
86. The plaintiff’s contract provided for the installation of underground steam lines totaling in excess of 4,000 feet in length. One section of approximately 1,500 feet consisted of a line extending directly from the existing boiler house west toward the hangar site. The other section and remainder consisted of a line at right angles to and connected with the terminus of the first section, with lateral extensions to the hangar and the 2 line shacks or operation buildings. These latter were located north and south of the hangar at the edge of the airplane apron and taxiway.
In respect to the first section of the steam line, it developed that a run of 750 feet from the boiler house to manhole A-A would not be mechanically functional if installed as designed. As a result it became necessary to redesign this section of the steam line so as to provide the addition of a 1-inch drip to drain condensate and also to provide an additional manhole adjacent to the boiler house to drain the drip line.
In respect to the second section of the steam line, the plaintiff was directed by defendant in writing on May 11, 1953, to withhold construction of these lines. The reason stated for this suspension of work was a proposed reduction of the size of the airplane apron adjacent to the hangar, which in turn would result in the relocation of the operation buildings or line shacks, and thereby require a revision of the steam lines leading to them.
The contract drawings upon which the plaintiff had bid were dated December 16, 1952, and those upon which the James D. Morrissey Company had bid were dated January 7,1953. As late as February 10, 1953, subsequent to the award of the contract to plaintiff, the defendant had not decided either the final location or the size of the parking apron to be constructed adjacent to the hangar. And as late as October 1953, defendant had not undertaken action to obtain title to or control of the necessary land. The size and location of the hangar governed location of the line shack, which in turn controlled the layout of the second section of steam lines to be installed by the plaintiff. Plaintiff was *732 given no indication at the time of bid that the location of the line shacks and steam lines was subject to revision either by relocation of the airplane apron or relocation of the line shacks.
37. Although on May 11,1953, the defendant suspended installation of the steam line in the vicinity of the hangar (this constituting more than half the total line), and promised an early revision of the appropriate drawings to relocate the line, it was not until September 18,1953, that a revision was issued. This revision relocated the line shacks and the steam lines closer to the hangar. However, it was canceled and on January 5, 1954, another revision was issued relocating the line shacks and steam lines back to the approximate original location.
It is clear that defendant had not decided where to locate, nor had it taken the necessary action to locate the steam lines to be installed by plaintiff as of December 16, 1952, when plaintiff’s contract drawings were issued; nor as of January 7, 1953, when the James D. Morrissey Company contract drawings were issued; nor as of January 30, 1953, when the plaintiff was awarded its contract; nor as of May 11, 1953, when work was suspended; nor as of Septmber 18,1953, when the first relocation of the steam line was issued. Nor was plaintiff advised that the location shown on the contract drawings was tentative only and that final location would be governed by decisions yet to be made, as well as by the availability of land.
The necessity of adding a 1-inch drip line to the section of the steam line extending from the boiler house was the result of defective design. Defendant has acknowledged that the steam line as originally designed would not have functioned properly without the 1-inch drip line. The defendant issued a revised drawing to provide for the needed drip line on August 27,1953. However, this revision was inadequate and it was necessary to issue supplemental revisions on February 4,1954, and again on March 10,1954.
There is no reasonable explanation of the above design defects, revisions, and protracted delays. There is no evidence indicating that these conditions arose as a result of a changed condition under Article 4(b) of the contract, a *733 change within the scope of the contract under Article 10(a), or by any action or omission of plaintiff.
While it is not possible to precisely delineate the specific days as to which the entire job was delayed by the defendant in the execution of the steam line work by the plaintiff, on all the evidence it is found that the defendant unreasonably delayed the steam line work by 30 days.
38. The sprinkler-water line system consisted of water mains leading into the hangar and a network of sprinkler lines within the building, which was used for fire alarm purposes. Originally the water line extended from an existing manhole to the hangar building and around the east, west, and south sides of the hangar.
A revised drawing dated June 23,1953, was issued. This rerouted the 10-inch water line at the southeast comer of the building so that it would not interfere with the foundations for a second leanto which was eventually to be added to the building, although not at that time. Inasmuch as the defendant planned initially, when the hangar was first designed, to add a leanto at a subsequent date to the south side of the hangar, it was erroneous to design the water line in plaintiff’s contract drawings in such a manner as to conflict with those future plans.
On September 24,1953, another revised drawing was issued substantially changing the entire original design of the water line system. The 10-inch water line on the east side of the building was reduced to 8 inches as was the line on the west side of the building. A 10-inch water line was added to the north side of the building and an 8-inch water line was added at the northeast comer of the building. Additionally, the water line on the south side, where the future leanto was to be located, was deleted entirely.
As of September 17, 1953, the plaintiff was advised by defendant that another change in the water line was to be made in order to accomplish further adjustment to the construction of the second leanto. At this time the plaintiff was completing its concrete columns along the D and E lines. It was unable to continue with this work until the matter of the relocation of the water line had been resolved inasmuch *734 as that line had to be installed before the column footings could be completed.
During the remainder of September and part of October, plaintiff waited for defendant’s plan relocating the water line. Finally, on October 15,1958, the relocation was made. As a result of this unreasonable delay in the relocation of the water line, construction of the foundation was interrupted and this, in turn, delayed plaintiff’s progress in the construction of the hangar.
Although the defendant administratively determined that the project had been delayed 15 days as a result of the above-described delay in redesigning of the water line, and the contract time was extended by this amount in change order L, it cannot be found that the entire job was delayed by this number of days. The work of installing the water line overlapped the time of installation of the steam line. The finding as to delay relating to the steam line would include, therefore, delays in connection with the water line.
39. The contract plans provided for an open joint drain outside the base of the underground partial basement of the leanto for the purpose of draining the outside basement wall area. The contract provided that this drainage line would be extended 5 feet beyond the hangar. However, another prime contractor, who was constructing the apron around the hangar and doing certain other work, was to connect plaintiff’s drainage line with a drainage system approximately 160 feet way. Because of the delay in commencement of work by this other contractor, the connection was not made until late 1954.
On April 19,1954, the basement floor slab cracked, causing an opening about one-quarter inch wide which permitted ground water to enter into the basement. This rupture of the slab was caused by a greater amount of hydrostatic pressure against the underside of the slab from underground springs than was anticipated. Defendant’s resident officer conducted a study of the degree of hydrostatic pressure under the slab and this study was completed some time prior to June 2, 1953. However, no action was taken by defendant to correct the rupture and otherwise revise contract plans until the end of September 1954. Plaintiff was orally ad *735 vised of the changes to be made on September 22, 1954, but no written instructions were issued until October 6, 1954.
During this interval, prior to September 22, 1954, both the plaintiff and defendant’s resident officer requested several times that the officer in charge of construction promptly decide on the desired changes. No further work could be done in the basement pending the changes, and heavy mechanical equipment waiting to be installed could not be permanently put in place. Eventually, an extension of time of 80 calendar days was granted to plaintiff by defendant on the basis that the delay in issuing orders as to the repair of the ruptured slab and the changes to the drainage system delayed the project to that extent.
Plaintiff was reimbursed for its costs of performing the additional work. However, it was not reimbursed for its overhead and other increased costs resulting from the delay in performance and the extension of the contract by 30 additional days. Plaintiff’s claim for these costs was denied on the ground that it constituted a claim for breach of contract.
It is found that the entire job was unreasonably delayed by 30 days by reason of the inadequate provision in the plans for draining away water which ultimately became trapped by the floor slab, causing its rupture.
The changes to the drainage system directed by defendant consisted of installing in the basement floor, drainage tile into which the ground water under the floor slab drained. This tile was connected with the already installed drainage system of the floor itself which drained water from the upper surface of the floor. The new tile was at a lower elevation than the french drain and therefore the latter no longer served as a drainage for ground water.
It is noteworthy that the french drain had been provided for in plaintiff’s contract by Addendum No. 1 dated January 12, 1953, whereas the original contract plans were dated December 18, 1952. It appears that the addendum was issued as the result of the discovery by Capitol Engineering Company, designer of other work at the Naval Air Station at that time, of the existence of underground springs in the *736 area. However, the french, drain was not adequate for the control of ground water, if such was its purpose, in view of the slab rupture which occurred and the fact that the defendant replaced the french drain by an addition to the floor drain for the purpose of controlling ground water.
40. As previously noted, the original plans provided for a one story building, called a leanto, with a partial basement to be constructed at the north side of the hangar. It was to be 240 feet long by 100 feet wide and was to house maintenance shops.
On October 1, 1953, the defendant notified plaintiff that a second leanto was to be constructed at the south side of the hangar. In addition, defendant proposed to add a second story to the original leanto on the north side.
The original contract drawings showed on the plot plan and at one or two other points that a second leanto was a future possibility by the notation thereon of “Future Bldg.” The addition of a second floor to the original leanto was also a future possibility in that the drawings provided that the top of the leanto would consist of a floor covered with a temporary roof.
Plaintiff was not informed during bid nor prior to October 1, 1953, that the leanto additions would occur during performance by plaintiff of his contract nor that they would be constructed by a separate prime contractor. Plaintiff had no reason to anticipate such development and, in fact, the plans as cited above indicated the contrary.
41. When the plaintiff was notified of the proposed plans for leanto additions on October 1, 1953, it was given an undated letter together with a set of its own contract drawings containing superimposed thereon crayon markings showing the then-planned deletions to plaintiff’s work for the purpose of adjusting to the additions. On December 29,1953, plaintiff was given revised editions of its own contract drawings showing these deletions and on February 26,1954, re-revised additions were issued.
The revised drawings forwarded to plaintiff on December 29,1953, contained revisions to 57 of the total of 73 original contract drawings. The drawings forwarded on February *737 26, 1954, consisted of re-revisions of 12 of the drawings previously forwarded plus a revision of an additional drawing. As a result, all but 16 of the 73 original contract drawings were modified at least once by the leanto changes.
Defendant contracted the design of the plans for the leanto additions to a different architect-engineering firm than the one which had designed the work performed by plaintiff or the one which had designed the airplane apron and other construction in the immediate vicinity of the hangar. The contractor for the leanto additions was also a different contractor than the 3 prime contractors already performing construction work on the hangar and in the immediate vicinity thereof. This new contractor commenced performance while plaintiff was still performing its work on the first leanto, causing great inconvenience to plaintiff’s performance.
42. The addition of the second leanto resulted in the deletion of a large portion of the wall and the beams on the south side of the hangar being constructed by the plaintiff as well as the deletion and modification of numerous other items of work involved therein. Similarly the addition of the second floor of the original leanto resulted in the deletion of the roof contemplated in plaintiff’s drawings and the conversion of it to a floor as well as the deletion of the mechanical equipment room mounted on the original roof.
The drawings issued to plaintiff on October 1, 1953, December 29,1953, and February 26,1954, were simply and only original contract drawings on which were encircled various elements of work to be omitted by reason of said changes. No details were given as to how plaintiff was to finish or construct up to the point of the deletion, or to relocate the utility lines, or attachments which were originally designed to be located at or on the deleted portions of the building. No specifications or details were given, for example, to show where a utility line was to be rerouted or how it was to be terminated by reason of the deletions. Nor was any provision made for the protection of the finished interior work during the winter of 1954-55 while the building remained open by reason of the deletion of a wall and the roof, pending construction by a new leanto contractor.
*738 The revised drawings should have shown affirmatively what work was to be done rather than simply showing encircled items to be deleted without indicating what adjustments to nondeleted work were to be accomplished. As a consequence, there were innumerable delays and confusion in determining through conferences and field design what specific adjustments defendant desired. This required the constant attention of plaintiff’s personnel to supplement the deficient revisions. In essence, defendant’s revisions were simply a makeshift method of adjusting plaintiff’s contract to the construction of an additional leanto and the second floor on the original leanto.
43. The extensive deletions to plaintiff’s contract resulting from these leanto changes, the inadequate revisions of the drawings, and the performance by another contractor of a substantial amount of work on the same structure plaintiff was erecting, were not contemplated by the parties at the time of contract bid and award and did not constitute a change within the scope of the contract as provided by Article 10(a) thereof. Furthermore, these changes to the contract were made at a time when the job was seriously retarded by reason of prior design defects and delays in making appropriate revisions which were the responsibility of the defendant.
In the change order covering the leanto changes, the contract price was reduced by approximately $30,000 but the time for completion of the work was increased by 64 days. It is found that the defendant unreasonably delayed the entire job by a period of 30 days by reason of the manner in which the defendant effected the changes in design and the interference to the plaintiff’s work by other contractors who were engaged in construction on the same building which the plaintiff was constructing.
44. There were 16 change orders issued on this proj ect. All change orders were accepted in writing by the contractor, and the larger ones (those in excess of $10,000) were the subject of negotiation and recommendation by a board on changes, on which board the contractor had a representative, usually Mr. Crawford or Mr. Lipsett. The texts of the *739 change orders are in evidence, together with correspondence thereon, in plaintiff’s exhibit 10, and are incorporated herein by reference. For convenience, they are summarized as follows:

SUMMARY OF DELAYS
45. From the foregoing findings it has been found that the defendant unreasonably delayed the plaintiff in the performance of the contract work by a total of 420 days. This total is made up as follows:
Days Foundation (see finding 31)- 330
Steam line (see finding 37)- 30
Rupture of floor slab- 30
Leanto changes_ 30
Total_ 420
*740 DAMAGES
46. One item of claim referred to in earlier findings has been withdrawn. This relates to direct engineering expense and is quoted in item 3 of finding 7 in the amount claimed at $29,147.62.
47. Since there was an overrun on the contract performance time of 518 days, of which 420 days have been found to be chargeable to the defendant as unreasonable, some pro-
, ration of the cost to the plaintiff of such delay is indicated. Accordingly, 81 percent of the plaintiff’s cost of delay is chargeable to the defendant.
48. The parties, prior to trial, complied with the pretrial rule — the plaintiff stated its damages as shown by its books and records, and the defendant (after having audited the books and records) stated its differences. The plaintiff accepted the defendant’s audit of its books and records as accurate.
49. (a) By reason of the interruptions to plaintiff’s operations ensuing from the various revisions to the foundations, the utility lines, and the leanto, as previously described, and from the protraction of the operations over more extended periods than would otherwise have occurred, plaintiff was unable to make efficient and full use of certain items of equipment. From time to time its crane, compressor, bulldozer and trucks stood by idle, awaiting resumption of some item of work interrupted by revisions of the plans.
Prior t© December 4, 4953, the original completion date; the equipment was Idle at various periods primarily as a result of the foundation delays. The total east to plaintiff was $4,473.74. T-hls is computed on the basis of one-half the fair rental rate of such equipment. xrrft q o fi'nín i dirt n 4- Trn m <-vn n 4-ttaa /■>(-< f I ^1a r\ 4a v\l ff as- ill /-» WltO tvgxvxTX xtxlO WV V UiT J-VJ U.O UllllCU. •atTTt? “vyfTU t5v7 ■pXtCXlJCUiJJ. OT tUlt) equipment while idle; together with operators thereof,- was $9,834.53, on the basis of one-half the fair rental rates
Aeeendingly-,- the total eest to plaintiff of idle equipment was $44,398.24, on the basis of one-half the fair rental rates Prior to December 1, 1953, the original completion date, *741 the equipment was idle at various periods primarily as a result of the foundation delays. The total cost to plaintiff of the equipment while idle, together with operators thereof, was $4,473.71. This is computed on the basis of the applicable Associated General Contractors’ (A.G.C.) rate for such equipment as stipulated by the parties at trial, but at one-half such rate.
In December 1953 and through 1954, plaintiff’s equipment was again idle at various times. The cost to plaintiff of the equipment while idle, together with operators thereof, was $9,834.53, on the basis of one-half the A.G.C. rate.
Accordingly, the total cost to plaintiff of idle equipment was $14,308.24, on the basis of one-half the A.G.C. rate.*
If the equipment had not been committed to the Willow Grove job, plaintiff would have used it at other large projects which it was then performing in the Philadelphia area.
It appears from the defendant’s audit that the equipment referred to above was owned by the plaintiff, and was not equipment which it had rented.
(b) The plaintiff expended for field supervision the total amount of $41,470.95 during the period of the overrun of the contract for 518 days from December 1,1953.
50. During January and February 1954, it was necessary for the plaintiff to provide protection to the concrete when such was being poured during the particularly cold weather. The contractor had to furnish salt, hay, tarpaulins, salamanders and labor to provide this protection. These expenditures would not have been necessary if the foundation redesign as previously described had not occurred, inasmuch as the pouring of concrete would have been completed prior to those 2 months.
The parties have agreed that plaintiff expended the sum of $3,220.29 for this item.
51. Many materials which had been ordered and delivered to the job prior to December 1,1953, could not be used in the normal course of construction because of the interruptions to job progress previously described. As a result it was necessary for plaintiff to incur additional cost in sheltering and *742 storing such, materials. Certain items had to be rehabilitated prior to usage on the job after long periods of storage under damp conditions. For example, rust had to be removed from reinforcing and steel sash. Materials designed for usage in portions of the work which were deleted by leanto changes and which had been temporarily stored had to be removed from storage and turned over to the new prime contractor for use in constructing the second leanto, and the second floor on the original leanto. The arch framework used in the pouring of the arch concrete on the job had arrived in May 1953, the month when it was scheduled for use. It was maintained in storage for almost one year and during that time a certain amount of deterioration occurred which required reinforcing repair prior to erection for the pouring of the arch.
The total cost to plaintiff for the protection and handling of this material amounted to $5,935.81.
52. From the beginning of the contract, when job progress was first interrupted by the foundation difficulties, several utility trenches and many of the foundations remained open for extended periods of time pending revision and final decisions as to contract changes. This continued through September 1954 and it was necessary for the plaintiff to maintain these openings in the ground in a secure and safe condition. Open trenches required sheeting and bracing at several locations, sloughed-in material had to be removed, and pumping was a constant necessity. At driveways and locations where traffic had to pass it was necessary to install and maintain temporary bridges across trenches, whereas if they had been open only for the usual limited period, such would not have been necessary. Barricades and lights were necessary around openings to prevent accidents and injury to personnel having business in the area.
The total cost to plaintiff for this maintenance of the utility trenches and other excavations was $9,931.27.
53. In July 1954 the Morrisey Company was performing blasting operations to remove rock on land adjacent to the hangar building which had been then partially completed by plaintiff. Because of the risk that such blasting operations would damage the construction then accomplished by plain *743 tiff, insurance against damage to the structure was taken out by plaintiff at a premium cost of $1,119.40.
But for the delays heretofore cited, plaintiff’s project would have been completed before this risk to its performance occurred. It was an unreasonable interference with plaintiff’s work for defendant to schedule, much less to permit, blasting upon an adjacent site at the risk of damage to the hangar. There was no provision in plaintiff’s contract putting it on notice that such blasting would occur and there was no provision relieving plaintiff of the responsibility for any damage which might occur.
54. Because plaintiff’s performance was extended beyond the original completion date of December 1,1953, it incurred certain additional expenses by reason of increase of wage rates and increase of material costs. The resulting increase in the wages paid by plaintiff between December 15, 1953, and April 30,1954, amounted to $6,478.04. Additional wage increases occurred between May 1,1954, and the completion of the j ob, thereby increasing plaintiff’s wage costs in the amount of $16,275.09. These wage increases totaled $22,753.13.
Additionally, plaintiff paid higher costs for certain materials which it purchased for use on the job than it would have paid if the job had been on schedule. In 1954 a manufacturer’s cement strike occurred requiring plaintiff to obtain cement elsewhere at an increased cost of $421.70. A price increase for wire mesh subsequent to the delivery date for this material, if the job had been on schedule, in the amount of $1,133.56 was incurred. A general price increase for concrete occurred on January 1, 1954, increasing plaintiff’s costs for this item in the amount of $2,512.68. Plaintiff also expended sums in the amount of $2,002.43 for reinforcing steel and $600 for lumber by reason of price increases which occurred subsequent to the delivery dates if the job had been on schedule. These increases totaled $6,670.37. After a miscellaneous deduction of $57.02, there remained a net increase in material costs by reason of the protraction of the contract in the sum of $6,613.35. The total of both the wage and price increases which occurred was $29,366.48.
55. The plaintiff’s overhead at its main New York office and its Philadelphia sub-office allocable to the contract in *744 suit was $171,228.68. There is no dispute between the parties as to this figure, since it results from the Government audit of the plaintiff’s claim. This is a total figure covering the overhead for the entire contract period of 818 days. At $209.33 per day, the plaintiff, therefore, expended $108,430.87 for such overhead during the 518 days of the period of the overrun. The plaintiff has, however, already been paid $11,350 for such overhead in connection with change orders which had been issued and for which it has been compensated. A further deduction of $19,366.88 should be made on account of an overlapping with field office overhead figures, according to the FBI audit, which the plaintiff accepts as correct. It thus appears that the plaintiff’s net home office overhead figure for 518 days of the contract overrun would be $77,713.99.
56. Between December 1, 1953, and March 10,1954, plaintiff’s operations included excavation for trenches and foundation construction above the footings. The foundation work would have been completed in June 1953, if there had not been a redesign of the foundations, and clearly before the winter of 1953-54. The utility trenches similarly would have been completed well before the winter if the delays heretofore mentioned had not occurred. As a result of performing its operations in the cited winter months, the adverse weather conditions reduced the productivity of plaintiff’s labor force. The plaintiff’s labor cost during this period was $49,293.39. Although there was expert testimony, not contradicted, that the loss of productivity was 33% percent, this, from our knowledge and experience in other similar cases, appears to be somewhat higher than it should be. It is found that a 20 percent figure would be adequate in the premises. This results in a figure of $9,858.68 to which should be added 12% percent insurance of $1,232.34, making a total of $11,091.02 for loss of productivity during this period.
During the months from March 11, 1954, to August 11, 1954, plaintiff’s operations included the construction of arch columns and the hangar floor. This work required the construction of mud sills for supporting the forms used in pouring columns and the hangar floor as well as requiring other measure^ to minimise water problems encountered. As a *745 result of performing this work under adverse water conditions, the productivity of plaintiff’s labor forces was reduced. An expert estimate of this loss of productivity was 25 percent of the labor costs for the period. Based upon our knowledge and experience in other similar cases, this estimate seems too high. It is found that a figure of 10 percent would more adequately represent the loss sustained by plaintiff, which constitutes a total of $13,014.87 for loss of productivity during this period.
During the period from August 12,1954, to November 24, 1954, there were constant revisions to the contract drawings as a result of the leanto changes, as previously described. Plaintiff’s expert witness testified that this indefiniteness in plans resulted in confusion and interruption of normal job progress and reduced the productivity of plaintiff’s labor force 20 percent for the cited period. No other evidence appears in the record to support this estimate that the efficiency of plaintiff’s labor force was reduced as a result of these revisions to the leanto plans; nor is this the kind of circumstance, such as winter weather or adverse water conditions, which we have generally recognized in the past as resulting in a loss of productivity of labor. Therefore, plaintiff’s claim for loss of productivity during this period is disallowed for failure of proof.
During the period from November 25,1954, to January 19, 1955, plaintiff’s operations were performed under severe winter conditions and in a structure which was not enclosed by reason of the leanto deletions previously described. Because of these conditions, the productivity of plaintiff’s labor force was reduced from that which would have existed if such conditions had not been encountered. An expert estimate of this loss of productivity is 20 percent of the labor expenses during the period. Our knowledge and experience in somewhat comparable cases tells us that a figure of 10 percent would more adequately represent plaintiff’s loss. Accordingly, it is found that plaintiff suffered a total of $925.50 for loss of productivity during this period.
The total loss in labor productivity thus amounts to $25,-031.39. Because of an overlapping of the audited figures *746 upon, which the above figures have been based (the FBI audit), a deduction of $4,550.63 should be made. The resulting figure is $20,480.76.
SUMMARY OK DAMAGES
57. Since the defendant caused the plaintiff to be delayed 420 of the 518 days of the job overrun, the plaintiff suffered damages of 81 percent of its delay costs enumerated in prior findings (with the exception of the insurance premium referred to in finding 53, and as to this item, plaintiff’s damages were 100 percent of the premium which it was required to pay). The damages may be summarized as follows:
Idle equipment (finding 49)_ $14,304.24
Field supervision (finding 49)- 41,470.95
Winter protection (finding 50)- 3,220.29
Rehandling materials (finding 51)_ 5,935.81
Maintaining excavations (finding 52) __ $9,931.27
Wage and material price increases (finding 54)_ 29,366.48
Home office overhead (finding 55)_ 77, 713.99
Ross of productivity (finding 56)_ 20, 480. 76 Subtotal _$202,423.79
81 percent_$163,963.27
Insurance premium (finding 53)_ 1,119.40
Total _$165, 082. 67
This total represents the plaintiff’s damages due to the unreasonable delay caused by the defendant in plaintiff’s performance of the work covered by the contract in suit.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover of and from the United States, and judgment is therefore entered for plaintiff in the amount of one hundred sixty-five thousand eighty-two dollars and sixty-seven cents ($165,082.67).

 Luria Brothers & Company, Inc., as successor in interest to the original plaintiff Lipsett, Inc., has been duly substituted for the latter firm as plaintiff by order dated April 14, 1964. Hereinafter, the word “plaintiff” will be used to refer to Luria Brothers & Company, Inc. and/or Lipsett, Inc.

 The Board relied on the Dockery Act, as amended, 31 U.S.C. § 74, and onr decision in Brooks-Callaway Co. v. United States, 97 Ct. Cl. 689, 704 (1943), in determining that it no longer had jurisdiction over these claims. Since neither party has raised the issue, we express no opinion on the correctness of this determination by the Board in light of the subsequent Supreme Court decision in United States v. Anthony Grace & Sons, Inc., 384 U.S. 424 (1966).

 This same engineering expense item, although originally included as part of plaintiff’s claim before the court, was also withdrawn from the court’s consideration by the plaintiff.

 At the trial before the commissioner, both parties introduced evidence. The defendant did not object to the introduction of such evidence at any time until proof had been closed and the plaintiff had submitted its proposed findings of fact, under these circumstances we are of opinion, without deciding whether a trial de novo would have been proper had timely objection been made, that any objection that may have been available to the defendant has been waived. See Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 337 F. 2d 861 (1963), partially overruled on other grounds, United States v. Anthony Grace & Sons, Inc., 384 U.S. 424 n. 6 (1()66).

 The Ballinger Company subcontracted a portion of the design work to Roberts and Schaefer Company, an architectural firm which had designed a similar hangar for the military in the Denver, Colorado, area.

 Eight of the test borings were at the location of the hangar building and leanto and three were at the location of a “future” building which was to be on the opposite side of tile hangar from the leanto.

 Prior to this, on May 11, 1953, the defendant Rad forwarded to plaintiff a preliminary revised drawing. However, plaintiff was unable to resume foundation work on the basis of this preliminary drawing because revisions yet to be made, and consequently not appearing on the preliminary drawing, were essential to the resumption of work.

 A revision had also been issued on July 15, 1953,, by which elevations for some of the footings for the leanto columns were lowered and the slope between these footings and the adjacent E-line footings was limited.

 Home office overhead was allocated to the Willow Grove job based on its percent of total volume of business of the plaintiff. The percentage allocations for Willow Grove for the years 1953, 1954, and 1955 were respectively 13%, 11.7%, and 1.3%.

 The FBI audit shows that $19,366.88 of plaintiff’s claim for home office overhead was included in its claim item 3 (field supervision after December 1, 1953). The FBI auditors apparently determined that this amount was more properly includable in claim item 3 than in the claim for home office overhead.

 A mathematical calculation of the foregoing is as follows:
(Iff) X 171>228-68) -11,350 -19,366.88 - 77,713.99.

 The FBI audit also reflects a different method for calculating the additional home office overhead attributable to the 518-day overrun period. This method of calculation starts with the use of total home office overhead of $171,228.68 for the 818-day period of the contract work just as the method described above in the text. From this total figure, however, there is deducted $74,006, an amount equal to 5% of the original contract price. This 5% figure is apparently an estimate of what home office overhead would have or should have been had the contract been completed within the original 300-day contract period. Carrying out this calculation, the audit reaches a gross figure of $97,222.68 for additional home office overhead attributable to the 518-day overrun period. From this there are deducted $11,350 and $19,366.88, representing respectively the amounts previously received by change orders and costs duplicated in other claim items resulting in a net excess home office overhead amount of $66,505.80.
We reject the use of this method of calculation in the instant case since it is based upon the use of an additional estimate (the 5% figure) in determining the excess overhead. We are of opinion that the method described in the text more accurately reflects the additional home office overhead incurred by the plaintiff during the 518-day overrun period.

Second, third and fourth paragraphs of Finding 49(a) amended by Order dated January 13, 1967.